J. Irwin Shapiro, J.
This is an action, tried by the court without a jury, to recover damages for injuries sustained as a result of the alleged negligence of the defendant hospital in the removal of a pterygium over the nasal cornea of the plaintiff’s left eye. (Pterygium is a triangular overgrowth of the bulbar conjunctiva from the nasal side.)
At the close of plaintiff’s case the defendant moved to dismiss the complaint on the ground that plaintiff had failed to make out a prima facie case. Decision thereon was reserved. Defend *154 ant thereupon rested without offering any proof and renewed its motion to dismiss. Decision was likewise reserved on that motion.
The plaintiff is á 53-year-old woman who was operated on ky physician employees of the defendant hospital on March 8, 1961 and again on July 5, 1961.
The first operation was not successful because the pterygium was not completely removed. Further surgical procedure was therefore required and this took place on July 5, 1961. While plaintiff was still in the hospital the bandage over the left eye was removed, revealing a drooped left eyelid which plaintiff did not have prior to the second operation.
Plaintiff, prior to the second operation, had no congenital anomalies of the left or right eyelid, nor did she sustain any traumatic injuries known to her that would cause a drooping eyelid (medically known as ptosis).
Plaintiff relied on her own testimony and the introduction of the hospital records, but called no medical expert to testify to the relationship, if any, between her operation and the drooping eyelid. ;
Crediting the plaintiff’s testimony in its entirety, as I do, that at the time the second operation began her left eyelid was in perfect condition and that immediately after the operation she had a drooping eyelid, and drawing the most favorable inferences that possibly can be extracted from her testimony and the hospital records, which I also do, the question resolves itself into whether, in the absence of expert medical testimony, plaintiff has presented sufficient evidence to establish a prima facie case.
■Since the doctors in this case were employees of the defendant hospital, upon the theory of respondeat superior, the hospital ■stands in the shoes of the operating physician. What, then, is the nature and extent of the duty owed by a physician to his patient? As far back as 1898, in the oft-quoted case of Pike v. Honsinger (155 N. Y. 201), the court laid down the basis of liability in such cases. Said the court (pp. 209-210): “ The law relating to malpractice is simple and well settled, although not always easy of application. A physician and surgeon, by taking charge of a case, impliedly represents that he possesses, and the law places upon him the duty of possessing, that reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where he practices, and which is ordinarily regarded by those conversant with the employment as necessary to qualify him to engage in the busi *155 ness of practicing medicine and surgery. Upon consenting to treat a patient, it becomes his duty to use reasonable care and diligence in the exercise of his skill and the application of his learning to accomplish the purpose for which he was employed. He is under the further obligation to use his best judgment in exercising his skill and applying his knowledge. The law holds him liable for an injury to his patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment. The rule in relation to learning and skill does not require the surgeon to possess that extraordinary learning and skill which belong only to a few men of rare endowments, but such as is possessed by the average member of the medical profession in good standing, Still, he is bound to keep abreast of the times, and a departure from approved methods in general use, if it injures the patient, will render him liable, however good his intentions may have been. The rule of reasonable care and diligence does not require the exercise of the highest possible degree of care, and to render a physician and surgeon liable, it is not enough that there has been a less degree of care than some other medical man might have shown, or less than even he himself might have bestowed, but there must be a want of ordinary and reasonable care, leading to a bad result. This includes not only the diagnosis and treatment, but also the giving of proper instructions to his patient in relation to conduct, exercise and the use of an injured limb. The rule requiring him to use his best judgment does not hold him liable for a mere error of judgment, provided he does what he thinks is best after careful examination. His implied engagement with his patient does not guarantee a good result, but he promises by implication to use the skill and learning of the average physician, to exercise reasonable care and to exert his best judgment in the effort to bring about a good result.” In George v. City of New York (22 A D 2d 70, 71), the court said: “ As regards the human body, its capacities and tolerances, it is a rare case where common knowledge is sufficient to show that an accident would not have happened without negligence.” Is this such a rare case 1 Can the court, as a layman, without regard to any special knowledge which he may have obtained either as a lawyer or as a Judge, say that the drooping of the eyelid in this case could not have occurred “ without negligence ”? Realizing that “No matter how lacking in skill or how negligent the medical man might be, it [is] almost impossible to get other medical men to testify adversely to him in litigation based upon his alleged negligence ” because *156 of the “ conspiracy of silence ” in this regard (Salgo v. Leland Stanford Jr. Univ. Bd. of Trustees, 154- Cal. App. 2d 560, 568),* the court should strain itself to compel a physician who knows, or should know, the reason for the questioned occurrence, to explain it. Such a requirement of 11 explanation is not too great a burden to impose upon those who wield instruments of injury and whose due care is vital to life itself.” (Dean Prosser, 37 Cal. L. Rev: 183, as quoted in Klein v. Arnold,, 203 N. Y. S. 2d 797, 800.)
However, in order to invoke the rule for a requirement of explanation by a treating physician it must first be shown that the condition complained of (1) was caused by an agency over which the doctor had exclusive control, and (2) that it is one which common experience shows would not have occurred unless there was negligence in the operation or control of that agency (George v. City of New York, supra). In this case, while the doctors had exclusive control over the patient while she was under the anesthesia, it is not within the common experience of mankind to say that this drooping eyelid is one which would not have occurred without some negligence in the treatment of the plaintiff.
The hospital record reveals that during the course of surgery an injection of anethesia was introduced into this very eyelid. It is obvious that the muscles and nerves of the eyelid control its upward and downward movement. How then can a layman say that the drooping of the eyelid could not have resulted even with the exercise of the greatest degree of skill upon the part of the treating physicians. Before there can be a recovery here, it is necessary for plaintiff to establish that there has been a deviation from the proper surgical and operative methods. In *157 a case like this, the mere fact of an unexpected result does not give rise to a presumption of negligence, and to permit a trier of the fact to indulge in such an inference would in reality permit speculation as to the basic cause of the injury. It is only when the results of the treatment are “ of such a character as to warrant the inference of want of care from the testimony of laymen or in the light of the knowledge and experience of the jurors themselves ’ ’ that expert medically-known evidence is not required to furnish the basis for a determination by a jury that there has been unskillful practice and medical treatment by a physician. (Benson v. Dean, 232 N. Y. 52, 56.) It is only when common sense suggests that the condition discovered is incompatible with proper surgery or proper medical treatment that there is a burden upon the defendant to go forward with an explanation.
Injury to a patient undergoing medical treatment raises no inference, from the mere fact of injury, as to whether it was traumatic or nontraumatie unless the surrounding facts and circumstances clearly warrant the drawing of such an inference. It is in those rare cases “where the matters are within the experience and observation of the ordinary jurymen from which they may draw their own conclusions and the facts are of such a nature as to require no special knowledge or skill ” (Meiselman v. Crown Hgts. Hosp., 285 N. Y. 389, 396) that expert medical testimony is not necessary for a plaintiff to make out a prima facie case. When “ the very nature of the acts complained of bespeaks improper treatment and malpractice ’ ’ then the defendant is under the necessity of going forward with evidence to justify his treatment. (Hammer v. Rosen, 7 N Y 2d 376, 380.)
In this case the very area in which the injury occurred was the center or the focus of the operation. The court, in the absence of medical testimony, cannot conclude that a drooping eyelid, following upon an operation to the eye, was caused by negligence. Semerjian v. Stetson (284 Mass. 510) is directly in point. There the defendant operated upon plaintiff’s right eye in order to remove a chalazion. In analyzing the plaintiff’s case and denying a recovery, the court said (pp. 514-515): “ The question here presented is whether a jury would have been warranted by reasonable inference in concluding that negligence of the doctor in putting the drops in the plaintiff’s eye was the cause of the conditions which appeared after the operation. The permissible drawing of an inference by a jury is a process of reasoning whereby from facts admitted or established by the evidence, including expert testimony, or from common knowledge and experience, a reasonable conclusion may be *158 drawn that a further fact is established. There was here no expert evidence other than what appears in the hospital report. The mere fact that pain, inflammation and an ulcer in the plaintiff’s eye followed the operation did not justify the inference of want of proper care and skill on the part of the doctor or warrant the conclusion that those conditions were the result of the doctor’s negligence. King v. Belmore, 248 Mass. 108,114. Boston v. Fountain, 267 Mass. 196, 202. There was no evidence tending to show the source or constituent elements of the liquid put in the plaintiff’s eye, the purposes for which it is commonly used, its ordinary effects and characteristics or that it was or was not in general use by doctors following or in connection with such operations upon eyelids. The mere fact that an unidentified liquid placed in an organ as sensitive as an eye was followed by pain and inflammation would not without other evidence warrant the inference by a jury that its use was improper. There was no evidence as to the character or extent of injury which might cause an ulcer in an eye or as to the ordinary origin, characteristics and development of such ulcers or as to causes which are commonly adequate to produce them. We are of the opinion that the record lacks elements which are essential before a reasonable inference can be drawn that negligence of the doctor caused the conditions appearing in the plaintiff’s eye after the operation and that the common experience and knowledge of a jury of laymen cannot supply the lack. In deficiency in essential evidence to justify the necessary finding of causal connection this case resembles Cross v. Albee, 250 Mass. 170, 173; Sheehan v. Strong, 257 Mass. 525, 528; Mason v. Geddes, 258 Mass. 40 and Goode v. Lothrop, 266 Mass. 518, 520. The doctrine of res ipsa loquitur is not applicable where as here the common knowledge or experience of men is not extensive enough to permit it to be said that the plaintiff’s condition would not have existed except for negligence of the person charged. Walker v. Benz Kid Co., 279 Mass. 533, 538. Mahoney v. Harley Private Hospital, Inc,, 279 Mass. 96, 101. Guell v. Tenney, 262 Mass. 54, 56.”
In Horace v. Weyrauch (159 Cal. App. 2d 833, 837) the court said: ‘ ‘ Whether the doctrine is applicable depends upon whether a layman can say, as a matter of common knowledge or observation, or from the evidence could draw a reasonable inference, that the consequences of the injection here involved were not such as ordinarily would have followed if due care had been exercised. ’ ’
There, too, “ the injury arose at the site of the injection ” and while there was in that case medical testimony to the effect that *159 the reaction which occurred was “ one of the risks of such an injection ” the court did not base its nonsuit on the testimony of the defendant’s doctors seeking to justify the result but, rather, upon the ground that ‘1 there would seem to be no basis for the doctrine of res ipsa loquitur.”
Cases like James v. Spear (170 Cal. App. 2d 17) and Dillon v. Rochaway Beach Hosp. (284 N. Y. 176), the two cases cited by plaintiff in support of her position here, are completely inapposite. In the James case, the plaintiff blacked out as the defendant stood over her examining her eye. She had never lost consciousness before. When she regained consciousness there was evidence of trauma to the eyeball and she immediately felt a pain in her right eye, which she could not open. The defendant told her “ it looks like a piece of steel had taken a cut, a piece off the eye” (p. 18) and his examination revealed a break in the surface membrane of the eye. There was testimony in that case that the abrasion could have been caused by any trauma, such as a surgical instrument striking the eye. It was in those circumstances that the court said (p. 20) that the appellant ‘ ‘ made out a prima facie case of negligence on the part of respondent, and the judgment of nonsuit must be reversed. From all of the evidence it could have been legitimately inferred by the jury that the abrasion of the cornea of appellant’s right eye was proximately caused by a negligent act of respondent while he was standing over her looking into the eye and using a surgical instrument. The evidence was ample to prove that the abrasion occurred at that time. The appellant’s blacking-out could be referred to the trauma that caused the abrasion, which in turn caused the extreme pain appellant was suffering when she regained consciousness. From the direct evidence, from opinion evidence and from respondent’s admissions it could be inferred that the abrasion to the cornea of the eye, which respondent was not treating, was the result of negligence during his treatment of the accessory tear duct. Stated in terms of the doctrine of res ipsa loquitur, which we hold was applicable, this injury was something which ordinarily does not occur in the absence of someone’s negligence; and the jury, under proper instructions, could have found that the abrasion was caused by an instrumentality in the control of respondent and was not due to any action or contribution on the part of appellant. Seneris v. Haas, 45 Cal. 2d 811 [291 P. 2d 915, 53 A. L. R 2d 124] Wolf-smith v. Marsh, 51 Cal. 2d 832 [337 P. 2d 70].” In the Dillon case, the plaintiff was operated on and his evidence, “if believed, showed that he had no burn on his foot when put into bed after the operation ” (p. 179). Thereafter, such a burn was found, The *160 foot was completely remote from the area of operation. It was contended that the defendant was negligent in permitting a lamp to come into contact with the plaintiff’s foot. Under such circumstances, considering the chain of evidence, the court held (p. 179) that there was sufficient “ to permit the jury to infer that the lamp caused the injury ” and that “ [t]o hold otherwise and to determine as a matter of law that the foregoing evidence is insufficient would impose an unduly stringent standard greatly in excess of the requirements of reasonable proof. (1 Wigmore on the Law of Evidence [3d ed.], § 41.) ”
The plaintiff is hoist by her own petard when she finds the necessity for reliance upon authoritative medical literature to establish that “ any local injury to the levator palpebrae superioris muscles, such as a stab wound, injury with a piece of glass or the like may produce mechanical ptosis due to the severance of the muscle or to its nerve supply”. (Traumatic Medicine and Surgery for the Attorney, by Paul David Cantor, M.D., LLB.)
If I could take judicial notice of the quotation in question and accepted it as accurate, it could readily be concluded that the anesthesia which, so far as the record discloses, was necessarily injected into the eyelid, may in its resultant possible effect be equivalent to “ a stab wound ’ ’ and that, without negligence, it may “ produce mechanical ptosis due to the severance of the muscle or to its nerve supply ”.
In this case the area of injury was within the circle of administration of treatment. It was to an area of the body closely connected with the portion of the anatomy upon which the operation was performed and a layman would not ordinarily have knowledge of what effect such an operation might have upon the muscles and nerves of the eyelid even with the exercise of the greatest possible surgical skill.
The court is therefore constrained to conclude, although finding all of the facts in favor of the plaintiff, that as a matter of law she has failed to make out a case. Judgment is therefore directed in favor of the defendant, dismissing the plaintiff’s complaint as a matter of law.

 Realizing the difficulty in obtaining expert medical testimony (for a plaintiff) in a malpractice action, the Court of Appeals recently noted:
“It is not always a simple matter to have one expert, a doctor in this case, condemn in open court the practice of another, particularly if the latter is a leader in his field. In consequence, the plaintiff’s only recourse in many cases may be to question the defendant doctor as an expert in the hope that he will thereby be able to establish his malpractice claim.
“There is nothing unfair about.such a practice. 9 * * In short, then, a plaintiff in a malpractice action is entitled to call the defendant doctor to the stand and question him both as to his factual knowledge of the ease (that is, as to his examination, diagnosis, treatment and the like) and, if lie be so qualified, as an expert for the ■ purpose of establishing the geuerally accepted medical practice in the .community.” (McDermott v. Manhattan Eye, Ear & Throat Hosp., 15 N Y 2d 20, 27-28, 29.)
The McDermott case, while dealing only with the right to call a defendant doctor to the stand and the nature and scope .of his examination, makes it obvious that he could also be examined to the same extent in an examination before trial.