Henry W. Lengyel, J.
The title to the claim has been amended to reflect the fact that Ronald G. Wright attained the age of 21 years between the date of filing the claim and the date of the trial. Said claim is for personal injuries sustained by Ronald G. Wright on February 13, 1964 and for medical expenses and loss of service allegedly sustained by his father, Charles A. Wright. The claim was duly filed.
During the evening of February 6, 1964, Ronald, who lived at home with his father and mother, became very distraught. His mother found him holding a syringe containing 100 cubic centimeters of insulin which he threatened to inject into his system. She took the syringe from him and then called her husband to assist her. Ronald was screaming and crying and stated he did not want to live. The father telephoned the family physician who recommended that he call the Syracuse Police Department, which he did. It required two policemen, Charles Wright and a younger son to get Ronald into the police car. He was taken to the police station and placed in a straightjacket. The police physician, Dr. Laffer, was called and examined Ronald in the early morning hours of February 7. Dr. Laffer stated that Ronald was hyperactive, confused, and disoriented and gave inadequate responses to his questions. He certified Ronald for admission into the Syracuse Psychiatric Hospital where he was admitted, on a voluntary status, at 1:45 a.m. on February 7. The admission certificate indicates a his *522 tory of an attempted suicide by barbiturates in July, 1963; the insulin episode related above; and, the fact that Bonald had threatened to commit suicide on several occasions. The impression of the admitting physician was that Bonald was suffering from psychosis-schizophrenia.
Syracuse Psychiatric Hospital was a four-story building with the ground or basement floor being almost fully above ground level. The top three floors were divided into three wards, “A” being the first floor, “ B ” the second floor, and “ C ” the third, or top floor. The hospital, which was operated under the “ open door ” policy, contained from about 60 to 75 patients. Consonant with the ‘ ‘ open door ’ ’ policy, all bars and other physically restrictive devices had been removed from the windows and doors of Wards “ A ” and “ B ”. However, in February, 1964, they had not as yet been removed from Ward “ C ” and particularly difficult and dangerous patients were usually treated in Ward “ G
The period of hospitalization from admission on February 7 to the evening of February 12 developed a roller coaster profile with valleys and levels of passivity and co-operation and peaks of resistance and stormy conduct. On at least two occasions Bonald left the hospital grounds without leave and was returned by the police. On one of these elopements, he left the hospital by jumping from the window of the men’s room on Ward “ A ”; or, the first floor.
On the evening of February 12 at about 8 :10 p.m., Bonald returned to Ward “ B ” after having been away from the hospital under a pass permitting off-ground privileges. It should perhaps be noted that the off-ground privileges were granted by one of the supervising psychiatrists, a Dr. Bubert. Blood was noted on his right hand and he claimed that he had cut his hand in the elevator. Later Bonald stated that he had been off the grounds and had had a fight at a local restaurant. The attendants, noted that his breath smelled of alcohol. Bonald started to leave the hospital at this time but was persuaded to remain by Dr. Newton, the doctor in charge of the hospital during that evening.
Subsequently that evening Dr. Newton, while on ward rounds, met Bonald who again demanded to be discharged from the hospital. He was insistent, argumentative, and stubborn in his demands. However, the doctor quieted him and he went back to his room. At about 12:00 midnight, Bonald again demanded to leave the hospital. He tried to leave by the elevator but was brought back to his ward. He then packed his suitcase and advised that he would leave via the window from *523 Ms second-story room. He stated that he knew how to jump so that he would not get hurt. He opened the window to his room but it was closed by a hospital employee. He was agitated and insistent on his right to leave the hospital. Dr. Newton was called to the ward and spoke to him and told him he would have to wait until the next morning to be discharged; and, that he should discuss this with his assigned doctor. The doctor knew his patient’s past history and was also aware of his conduct on the evening of February 12 and the early moments of the morning of February 13. Ronald left the doctor and went back into his room closing his door behind him. As the hospital policy was not to permit closed doors to patient’s rooms, the nurses partially opened the door. Dr. Newton advised the nurses that they could close the door if Ronald asked them to do so. Ronald requested that the door be closed and it was closed. Dr. Newton instructed the nurse and attendants to observe the patient through the large keyhole to the door, which they did. Ronald was observed to be sitting on the windowsill with his packed suitcase on his bed. One of the nurses also went into an adjoining room and looked out the window in an effort to ascertain what Ronald was doing. She saw him hanging by his hands from the window ledge. Before any nurse or attendant could reach him he fell to the ground with the resultant physical injury of a 50% compression fracture of the 12th thoracic vertebrae.
This is not a claim to be determined on the basis of adequate or inadequate supervision by nurses, attendants, or other hospital lay employees. The supervision given this patient was pursuant to and was directly the result of the orders of the physician in charge of the hospital on February 13. Therefore, the raison d’etre of the claim must be malpractice on the part of said physician who was a paid employee of the State.
In order to successfully prosecute this claim which sounds in malpractice, the claimants had the burden of proving that Dr. Newton did not possess that reasonable degree of learning and skill that is ordinarily possessed by physicians engaged in the specialty of psychiatry in the locality where he practiced; or, that Dr. Newton did not apply his skill with proper and reasonable care and diligence; or, use his best judgment under all the circumstances; or, that the treatment afforded this patient was not consonant with acceptable psychiatric medical standards in this community.
The claimants did not present any expert medical testimony on any of the above points.
*524 The proof discloses on February 13,1964 that Dr. Newton was a licensed physician of the State of New York. He graduated from the College of Medicine of Syracuse University in 1962, served a rotating internship - in Hawaii and commenced his residency in psychiatric medicine on July 1, 1963. He had served in that capacity in the Syracuse Psychiatric Hospital since November, 1963. Claimants’ attorney skillfully seeks by indirection to infer that Dr. Newton was not qualified to occupy the position that he occupied on February 13. However, without expert medical testimony so stating, we cannot find that Dr. Newton did not possess that reasonable degree of learning and skill that is ordinarily possessed by physicians engaged in the specialty of psychiatry in the general Syracuse area.
Claimants’ attorney in a persuasive brief seeks to bring this claim within the exception to the generally accepted rule that expert medical testimony is necessary in a medical malpractice action. (See 7 Wigmore, Evidence [3d ed.], § 2090.) He referred the court to several out-of-State opinions but more particularly to Hammer v. Rosen (7 N Y 2d 376) and Benson v. Dean (232 N. Y. 52).
As was stated in Charlton v. Montefiore Hosp. (45 Misc 2d 153, 157): “It is in those rare cases ‘where the matters are within the experience and observation of the ordinary jurymen from which they may draw their own conclusions and the facts are of such a nature as to require no special knowledge or skill ’ (Meiselman v. Crown Hgts. Hosp., 285 N. Y. 389, 396) that expert medical testimony is not necessary for a plaintiff to make out a prima facie case. When ‘ the very nature of the acts complained of bespeaks improper treatment and malpractice ’ then the defendant is under the necessity of going forward with evidence to justify his treatment. (Hammer v. Rosen, 7 N Y 2d 376, 380.) ” It was stated in St. George v. State of New York (283 App. Div. 245, 248, affd. 308 N. Y. 681) that: “ The diagnosis of mental cases is not an exact science. As yet the mind cannot be X-rayed like a bone fracture. Diagnosis with absolute precision and certainty is impossible. * * * Of necessity it must be a matter of judgment by those qualified to pass judgment * * * there is no suggestion that the staff doctors were not competent and qualified and properly educated and trained, and there is no suggestion in the record that they were not sincere and conscientious in making their diagnosis.” In Taig v. State of New York (19 A D 2d 182, 183) it was stated that: ‘ ‘ The prediction of the future course of a mental illness *525 is a professional judgment of a high responsibility and in some instances it involves a measure of calculated risk.”
I do not believe that the acts complained of herein were of such a nature as to remove them from the necessity of expert medical opinion to establish a prima facie case. Although as a Judge I might be considered to have more knowledge and experience than the average lay jury, I do not consider myself capable of assessing the expertise of Dr. Newton and the acceptability, or nonacceptability, of his psychiatric medical treatment without the assistance of expert medical testimony.
Even if I found that the nature of the acts herein came within the ambit of Hammer v. Rosen {supra) and the other cases cited by claimants’ counsel, the State did produce Dr. Newton, who was a duly qualified psychiatrist at the time of trial and he testified that he considered his medical judgment of February 13, 1964, to be in conformity with acceptable medical standards in the community and to have been sound medical judgment. Certainly claimants were then faced with the necessity of producing expert medical testimony to refute said testimony. However, none was forthcoming. Instead, claimants’ counsel in his brief discounted this statement of Dr. Newton and contended that the State seeks to avoid liability 1 ‘ by merely having the physician who was primarily at fault parrot a few magic words in his testimony with the hope of sanctifying his acts as reasonable care and treatment.” I do not find that to be the situation. I observed and listened to Dr. Newton carefully and find that he gave a reasoned and honest statement for his opinion. He unfortunately lapsed into the colloquial and at one point stated that he considered the patient to be bluffing and believed that his bluff should be called. I am not so aghast at such terminology as to determine that it must be equated with liability.
It is my opinion, and I so find, that claimants did not sustain their burden of proof.
I reserved decision on the State’s motions to dismiss this claim. I now grant such motions.