Thomas Russell Jones, J.
The defendants, Dr. Norman Stahl and Long Island College Hospital, have moved to set *165 aside a jury verdict for the plaintiff in the sum of $375,000, as apportioned against them — 60% and 40% respectively, in this malpractice action, for failure of proof. They contend that by no rational process could the jury base a finding in favor of the plaintiff upon the evidence presented. (McDonald v Metropolitan St. Ry. Co., 167 NY 66.) Each defendant seeks judgment as a matter of law (CPLR 4401), on the ground that there is insufficient evidence to warrant a verdict for the plaintiff. In the alternative, both defendants have moved to set aside the verdict and for a new trial, on the ground that the damages awarded are excessive (CPLR 4404, subd [a]).
The defendants have renewed their motions for judgment, made at the end of plaintiff’s case, on the ground that the plaintiff by his evidence has failed to make out a prima facie case, so that each defendant is entitled to judgment, as a matter of law.
The jury found that the plaintiff had not been reasonably informed about the significant risks of cataract surgery to enable a reasonably prudent person in his circumstances to decide whether or not to submit to the operation (cf. Zeleznik v Jewish Chronic Disease Hosp., 47 AD2d 199, 207). The jury also found, however, that plaintiff would nevertheless have submitted to the operation even if he had been reasonably informed about all of the significant hazards.
Upon a careful review of the evidence, which has been arranged in chronological order, for evaluation, the court concludes that the jury could not have fairly found that the defendant physician and hospital, committed any act of negligence which injured the plaintiff. The court can conceive of no reasonable interpretation of the testimony to support the conclusion that the defendant committed malpractice in May and June, 1970, which caused the plaintiff to lose his right eye on January 21, 1976. (Cornwell v Safeco Ins. Co. of Amer., 42 AD2d 127, 136-137; 4 Weinstein-Korn-Miller, NY Civ Prac, par 4404.09.)
The plaintiff, Vincent De Falco, was 75 years old on May 12, 1970, when he was admitted to Long Island College Hospital by Dr. Norman Stahl, an ophthalmologist, for the surgical removal of a senile cataract from his right eye. Mr. De Falco had consulted three other ophthalmologists who concurred with Dr. Stahl’s diagnosis and recommendation that surgical intervention was required.
The plaintiff consented to the procedure. On May 14, 1970, *166 Dr. Stahl performed a cataract extraction to remove the opacity from the plaintiffs right eye. The operation was uneventful, except for the surgeon’s note that an "hyphema”, i.e., a "drop of blood” remained in the eye. Dr. Stahl, who was the only medical witness to testify in the case, was called by the plaintiff, and said that the hyphema was one of the normal risks of cataract surgery. Dr. Stahl testified, without contradiction, that an hyphema was "usually absorbed by the body within a few days”.
The drop of blood was not resolved. On May 17, three days after the operation, the hyphema had degenerated into a "total hyphema”; notwithstanding the continued administration of drugs and medicaments by Dr. Stahl and hospital staff physicians. This condition was complicated by an infection which was discovered by Dr. Stahl on May 26 or May 27, 1970. Laboratory tests disclosed that the infection was caused by enterobacter and staph albus germs. Enterobacter is an organism found in the intestinal tract. Staph albus is a germ found in the air. Neodecadron, an antibiotic cortisone mixture, was prescribed postoperatively by Dr. Stahl, as a prophylactic against infection. The drug was administered continuously for 9 or 10 days following surgery. The plaintiff attempted to prove that use of neodecadron was contraindicated for the control of enterobacter and staph albus germs. Dr. Yale, a Ph. D. in organic chemistry, testified for the plaintiff concerning the properties of neodecadron. This doctor of philosophy in chemistry was not qualified as an expert in the science of pharmacology, which concerns the value and reaction of drugs. He possessed no medical experience whatsoever in respect of the efficacy of neodecadron in the treatment of infections under clinical conditions. The narrow gouge of his expertise and lack of any medical training rendered Dr. Yale’s testimony only marginally useful to explain the nature of the antibiotic used in the treatment of the plaintiff’s condition. In any event, Dr. Yale was not equipped to testify that any negligence or departure from accepted medical standards occurred when neodecadron was administered to control the plaintiff’s eye infection, either as a prophylaxis or after the infection became apparent.
Despite the continued administration of a variety of antibiotics and antidotes over a period of 20 to 25 days, in an effort to resolve the hyphema and overcome the infection, on June 15, the patient was discharged from the hospital with an "Iris *167 Prolapse due to corneal infection”. Dr. Stahl noted that his condition was "unchanged”, and added that "at this point, it appears that there is no reason to keep the patient here any longer. No surgical intervention at this time would be appropriate, due to the corneal infection.”
Four months later, on October 19, 1970, as plaintiff continued under the care and treatment of the defendant, Dr. Stahl, he was admitted to another hospital for the repair of the iris prolapse, which had developed at Long Island College Hospital. The diagnosis was that scar tissues had formed from the infection, which caused the iris prolapse. On October 20, 1970, Dr. Stahl performed a second surgical operation to repair the old iris prolapse. He then discovered that it was "firmly scarred down”. The plaintiff was discharged from this hospital several days later, with his condition substantially unchanged. Dr. Stahl continued to treat the plaintiff until November 29, 1970.
On January 21, 1976, Mr. De Falco’s right eye was surgically removed.

THE HYPHEMA: A DROP OF BLOOD IN THE PLAINTIFF’S EYE; NOTA RES IPSA LOQUITUR HAPPENING.

A drop of blood, called an hyphema, was found in plaintiff’s eye after the operation. Dr. Stahl testified that this phenomenon was one of the risks of cataract surgery; that a postoperative hyphema was usually absorbed by the body within a short time. The plaintiff offered no medical proof that the discovered hyphema was caused by any negligence of the surgeon. No expert testified that the postoperative hyphema was evidence of a departure from good medical practice.
Plaintiff attempted to use a quotation from the textbook of Dr. Norman Jaffe, entitled Cataract Surgery and its Complications, which stated that hyphema "May be the result of poor incision or inadequate suturing” (emphasis added), to prove that Dr. Stahl had been negligent. Although the defendant acknowledged Jaffe’s book to be an authoritative treatise on ophthalmic surgery, his concession could not serve as a substitute for expert medical proof. The textbook could certainly not be used to establish that the presence of an hyphema after surgery was per se, a sign of negligence or proof of malpractice, i.e., a departure from good surgical practice. The court permitted cross-examination of Dr. Stahl in regard to Dr. Jaffe’s textbook statements, to enable plaintiff’s counsel to challenge the witness’ competency and the accuracy of his *168 conclusions. Those quotations did not become evidence in chief on the issues in the case. (cf. McCormick, Evidence [2d ed], § 321, p 244; Richardson, Evidence [10th ed], § 373, p 352, and cases cited therein). Moreover, the word "may” in the Jaffe quotation renders that statement ineffectual to prove any contradiction in Dr. Stahl’s explanation of the hyphema phenomenon.
The sophisticated science of cataract surgery is beyond the ken of ordinary laymen. A postoperation hyphema was not a res ipso loquitur event. (Cf. Foltis, Inc. v City of New York, 287 NY 108, 116; Massa v Nippon Yusen Kaisha, 264 NY 283.) The thing could not speak for itself, as did the circumstances in the typical res ipso loquitur cases of Griffin v Norman (192 NYS 322), where a dentist extracted the wrong tooth while patient was under anesthetic, and Fogal v Genesee Hosp. (41 AD2d 468), where a patient suffered frostbite from use of a hypothermia blanket in vascular surgery, necessitating amputation of the lower extremities. Obvious medical "accidents” such as these clearly evidenced negligence per se. An hyphema was not of this character. It was not an occurrence that contained within itself any basis for an inference of negligence (Richardson, Evidence [10th ed], § 93). The trial court in Charlton v Montefiore Hosp. (45 Misc 2d 153, 157) said: "The court, in the absence of medical testimony, cannot conclude that a drooping eyelid, following upon an operation to the eye, was caused by negligence.” Like the drooping eyelid in Charlton (supra), the record in this case is barren of expert testimony to prove that an hyphema, following cataract surgery, was caused by the surgeon’s negligence. The plaintiff did not prove by competent medical testimony that his eye was ultimately enucleated six years later, as a result of the natural consequences of any wrongful act, neglect, or malpractice of the defendant surgeon, in respect to the hyphema found on May 14, 1970.

THE POSTOPERATIVE INFECTION.

The plaintiff claimed that the defendants’ malpractice could be fairly inferred from the fact that the infection which developed in his eye after surgery was not promptly and properly treated by the doctor and the hospital personnel. Plaintiff contended that the nurse’s notes and medication administration records, which indicated that he complained of pain and that he received pain-killing drugs, beginning on May 15, should have alerted the defendant to the fact that an *169 infection was present which called for immediate treatment. Dr. Stahl acknowledged that signs and symptoms of pain and the administration of narcotic drugs were evidence of infection. He testified, however, that he first discovered, and promptly treated the infection in the patient’s right eye on May 27, seven days after surgery. Specimens were then taken and cultures made to identify the germs. On May 30, the laboratory reported that the infection was caused by enterobacter, a germ found in the alimentary canal, and rare staph albus, an airbourne organism. In Charlton v Montefiore Hosp. (supra, p 158) the Supreme Court, by Shapiro, J., adopted a quotation from the case of Semerjian v Stetson (284 Mass 510, 514) for the proposition that: " 'The mere fact that pain, inflammation and an ulcer in the plaintiff’s eye followed the operation did not justify the inference of want of proper care and skill on the part of the doctor or warrant the conclusion that those conditions were the result of the doctor’s negligence.’ ”
Assuming, arguendo, that the infection was "plainly to be seen” on the day after the operation, the plaintiff nevertheless failed to establish any standard of good medical practice by which the jury could judge that Dr. Stahl had negligently ignored the apparent pathology. The plaintiff failed to present expert testimony to prove that the infection resulted from malpractice, or, that when it was discovered, the condition was not promptly treated by Dr. Stahl in accordance with accepted medical practice; and that, in either case, the defendant’s negligence was the proximate cause of the enucleation of his right eye six years later. "[T]he plaintiff’s case was barren of expert testimony tending to establish a deviation * * * from proper and approved medical practice”. (McDermott v Manhattan Eye, Ear & Throat Hosp., 15 NY2d 20, 25; cf., also, Meiselman v Crown Hgts. Hosp., 285 NY 389; Pike v Honsinger, 155 NY 201; Benson v Dean, 232 NY 52 [note that all infection cases cited in 81 ALR2d 597 required expert testimony].)
The presence of enterobacter and staph albus infections in the patient’s eye, one day or seven days after the operation did not automatically spell out negligence on the part of the surgeon or the hospital (cf. Dembicer v Rosenthal, 53 Misc 2d 777, affd 20 AD2d 758). Expert medical testimony was required to demonstrate that the infection was negligently caused or improperly treated by the doctors. Moreover, compe *170 tent medical evidence was lacking to establish a nexus between the defendant’s alleged lack of reasonable care in diagnosis and treatment and the bad result which ultimately developed. The law is that before liability may attach to a physician’s treatment of a patient, "there must be a want of ordinary and reasonable care, leading to a bad result” (Pike v Honsinger, supra, p 210; cf. Robbins v Nathan, 189 App Div 827). A mere error of judgment, absent negligence, or a bad result would not impose legal liability on Dr. Stahl or the hospital. From time immemorial, the disciplines of the medicine have been recorded as an inchoate melange of science and art. The practice of clinical medicine involves the experimental study, diagnosis and treatment of disease. By undertaking to perform a medical service, a surgeon does not, nor does the law require him to guarantee a good result.
The plaintiffs friend, Mrs. Tortora, testified that while visiting him in hospital, she had observed a nurse retrieve an eye patch which had fallen to the floor and apply it directly to the patient’s right eye. Reasoning that this testimony was credible, the plaintiff proposed that the jury might also draw a double inference therefrom, first that the fallen eye patch picked up enterobacter and staph albus germs from the floor, and second that these specific organisms thereby entered the plaintiff’s eye and caused the infection, which led to the loss of his eye. This attempted syllogism lacked an expert’s explanation to show how enterobacter and staph albus bacteria are spread and how these germs cause infection, for a jury may not speculate as to negligence or causal connection (Taylor v City of Yonkers, 105 NY 202), nor can the common experience and knowledge of a jury of laymen bridge this scientific gap (cf. Charlton v Montefiore Hosp., supra, p 160).
The court determines as a matter of fact and law that the unresolved drop of blood which remained in plaintiff’s eye after the operation, and the infection which later developed did "not justify the inference of want of proper care and skill on the part of the doctor [n]or warrant the conclusion that those conditions were the result of the doctor’s negligence” (Charlton v Monteñore Hosp., supra, p 158).

A HOSPITAL’S LIABILITY.

A hospital cannot be held liable for the acts of its employees under the doctrine of respondeat superior absent proof of some negligence, which causes injury to the patient (cf. Bing v Thunig, 2 NY2d 656). Examples of such "plainest sort of *171 negligence” were found in the cases of Bing v Thunig (supra, pp 659-660), where an inflammable antiseptic spilled onto sheeting underneath plaintiff on the operating table and caught fire; in Phillips v Buffalo Gen. Hosp. (239 NY 188), where a scalding hot water bottle was placed against a patient’s body, and in Dillon v Rockaway Beach Hosp. (284 NY 176), where an electric light lamp was negligently left under the patient’s sheets by an attendant and burned his foot.
If a hospital employee’s acts require professional skill and knowledge, however, then it is a case of malpractice. To establish malpractice by a hospital, expert medical testimony must be offered to demonstrate that a resident, interne, nurse or technician, as the case may be, violated some accepted standard of good professional practice and injured the patient. (Cf. Morwin v Albany Hosp., 7 AD2d 582.)
Vincent De Falco’s complaint alleged that the hospital failed to provide proper postoperative nursing care in treating a corneal infection and thereby caused a permanent injury to his eye. The plaintiff accused the hospital of "plain negligence”, by presenting a witness who testified that she had observed a hospital nurse apply a presumably unsterile bandage to his right eye. The plaintiff advanced the proposition that the fallen eye patch had become contaminated with enterobacter and staph albus germs on the floor, and then asked the jury to accept that these malignant organisms festered in plaintiff’s eye and caused the corneal infection. Plaintiff urged that this mixture of testimony and inference justified the conclusion that Long Island College Hospital was negligent in treating his condition.
Even if it be assumed that the fallen eye patch had become contaminated with some germs, this court cannot analogize, as plaintiff urges, the obiter dictum expressed by the California District Court of Appeals in Mastro v Kennedy (134 P2d 865 [Cal], that the result of an unsterile condition is "a matter of common knowledge”. To assume "common knowledge” in this case would be to take it for granted that laymen know that enterobacter and staph albus germs are to be found on hospital floors; that these virulent microbes can enter the human body by contact with an eye patch and thereby cause an infection. "[T]he science of medicine in recondite * * * [I]n the ordinary case of malpractice, a jury is not equipped to determine the issue of negligence simply as an inference from the circumstances (Benson v. Dean, 232 N. Y. 52, 56; Charlton v. *172 Montefiore Hosp., 45 Misc 2d 153; see ann. 81 ALR 2d 597, 82 ALR 2d 1262).” (Pipers v Rosenow, 39 AD2d 240, 243.) Without the testimony of medical expert to educate them with regard to these esoteric micro organisms, lay jurors do not know the nature or behavior of enterobacter and staph albus and their effects on the human anatomy. The jurors’ total knowledge of these bacteria was enlarged, and limited, by the hospital laboratory reports that they even existed (!), and by Dr. Stahl’s testimony that they were contagious. No testimony was presented to show that the eye patch was, or might have been contaminated by these germs. In the case of Filanowicz v Guarino (27 AD2d 666), the Appellate Division, Second Department, reversed a judgment against a defendant physician based on the alleged negligent use of contaminated eyedrops, and said: "There was no proof in the record that in fact the eyedrops were contaminated by the organism which was established to be the source of the infection resulting in the removal of her eye”. The court declared that it was error for "the experts to speculate that the eyedrops * * * were the source of the infection” (emphasis added). The eye patch incident in this case cannot serve as a predicate for the finding of fact by the jury that the eye patch carried a specific infection into the patient’s eye, since it lacked the support of expert testimony to establish the nature, characteristics or even the probable presence of the infection-causing germs on the hospital floor or in the eye patch.
The plaintiff also claimed that the eye patch incident, if credited by the jury, constituted malpractice. Agreed. It would be a matter of common knowledge that such an act was unsanitary, and obviously not in accord with good nursing practice. The act of placing a presumably soiled eye patch over a patient’s eye, by its very nature bespeaks improper treatment and malpractice. (Cf. Morgan v State of New York, 40 AD2d 891, mot for lv to app den 31 NY2d 974, affd 34 NY2d 709, cert den 419 US 1013.) Nevertheless, such an obviously unsanitary procedure lacked the requisite expert testimony to prove that the presumably unsterile eye patch carried enterobacter and staph albus germs from the floor to the plaintiff’s eye and caused the infection. There was no evidence that the presumably soiled bandage was the cause of the infection. Causal connection between the nurse’s act and plaintiff’s injury was not established by competent medical testimony (cf. White v Lehigh Val. R. R. Co., 220 NY 131).
*173 The court has accorded plaintiffs contentions every reasonable inference that the evidence permits. Notwithstanding the interpretation of the evidence in a manner which favors the plaintiffs claims, a fatal flaw remains; that there is no proof of a causal connection between the acts of the defendants and the injuries sustained. The jury could not have reached its verdict by any rational process upon the evidence presented. (Cf. Blum v Fresh Grown Preserve Corp., 292 NY 241, 245.)
The defendants’ motion for judgment as a matter of law, pursuant to CPLR 4404 (subd [a]), is granted. The complaint is dismissed.
The plaintiffs motion for judgment as a matter of law, pursuant to CPLR 4404 (subd [a]), on the issue of lack of informed consent, is denied.