**Kenneth E. SITTS, Plaintiff-Appellant,**

v.

**UNITED STATES of America,
Defendant-Appellee.**

**No. 155, Docket 86–6110.**

United States Court of Appeals,
Second Circuit.

Submitted Oct. 2, 1986.

Decided Feb. 2, 1987.

Hancock & Estabrook, Syracuse, N.Y. (Janet D. Callahan, Syracuse, N.Y., of counsel), for plaintiff-appellant.

Frederick J. Scullin, Jr., U.S. Atty. for N.D.N.Y. (Paula Ryan Conan, Asst. U.S. Atty., Syracuse, N.Y., of counsel), for defendant-appellee.

Before KAUFMAN, KEARSE and ALTIMARI, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff Kenneth E. Sitts appeals from a final judgment entered in the United States District Court for the Northern District of New York, Howard G. Munson, *Chief Judge*, summarily dismissing his medical malpractice claim against defendant United States of America, brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* (1982), for damages allegedly resulting from a spinal operation he underwent at a Veterans Administration ("VA") Hospital in 1978. The district court granted defendant's motion for summary judgment on the ground that under New York law, which the parties agree is the applicable substantive law, Sitts would be required to introduce at trial expert medical testimony on the issues of negligence and causation and that Sitts had failed to identify any such expert who would testify for him at trial. On appeal, Sitts argues principally that expert testimony was not required in his case because the questions to be decided are within the ordinary experience and knowledge of lay persons and that, in any event, defendant's motion for summary judgment was not adequately supported and revealed the existence of issues of fact to be tried. Finding no merit in these contentions, we affirm.

## I. BACKGROUND

### A. *The Events*

Most of the pertinent historical facts, relating to spinal surgery undergone by Sitts at a VA Hospital in Syracuse, New York ("Hospital") in 1978, are not in dispute and may be summarized briefly. For some time prior to 1978, Sitts had experienced pain in his lower back and left leg, and had consulted doctors at the Hospital. After bed rest and medication failed to alleviate his symptoms, X-rays and a myelogram were taken and Sitts was diagnosed as having a bulging or herniated disk between the last lumbar vertebra (called "L5" in medical terminology) and the first sacral vertebra (called "S1").

The VA physicians advised a laminectomy to remove the bulging material from the "L5–S1 interspace," and Sitts underwent surgery in November 1978. As performed, however, the surgery removed material from between the first two sacral vertebrae (S1 and S2), and not between L5 and S1. Following the operation, when Sitts' pre-operation symptoms persisted, X-rays and a second myelogram disclosed that the laminectomy had been performed at the wrong site. In October 1979, Sitts underwent a second operation which resulted in the removal of the bulging material at the L5–S1 interspace.

### B. *The Present Lawsuit*

In August 1980, having first pursued his administrative remedies as required by 28 U.S.C. § 2675, Sitts commenced the present action, alleging that the first operation was negligently performed, caused a worsening of his back problems, and caused him great pain and suffering. After a period of apparent inaction, there followed pretrial discovery which included document production by both sides, interrogatories to Sitts, and depositions of VA doctors.

Dr. Wayne Eckhart, the orthopedic resident who performed the 1978 operation, testified at his deposition that he had followed the procedure normally used by members of his profession to locate the site of the prescribed laminectomy, *i.e.*, the L5–S1 interspace. As described by Dr. Eckhardt and other orthopedic surgeons whose depositions were taken, the upper end of the human spine normally has five lumbar vertebrae, with adjacent vertebrae separated by cartilage, or disk material, and space; these vertebrae can be manipulated up and down individually in relation to one another in a pistoning-type movement. Below the lumbar vertebrae are the sacral vertebrae; the sacral vertebrae are normally fused together into one bone called the sacrum and cannot be individually pistoned. It is rare that there is movability between the sacral vertebrae—a condition called "lumbarization."

The procedure normally used in locating the operative site for a laminectomy was to make incisions exposing the spine, then to grasp vertebrae and use pistoning motions to find the sacrum, ordinarily the place where no further movement is possible; from that place, the surgeon would simply count vertebrae either up (through the lumbar area) or down (through the sacral area) until he reached the desired level. In the 1978 operation on Sitts, Dr. Eckhardt used this procedure to search for the L5–S1 interspace. Finding bulging and soft disk material between the lowest movable vertebra and the highest immobile vertebra, he concluded that he had located the L5–S1 interspace; he removed that material and concluded the operation.

In fact, the X-rays and myelogram taken after the 1978 operation revealed that Sitts's spine had lumbarization between S1 and S2, and the material removed by Dr. Eckhardt came from that level; the bulging disk material at L5–S1 was not removed until the October 1979 operation.

As part of its discovery of Sitts, the United States served interrogatories in 1983 which asked, *inter alia*, whether Sitts had employed an expert to act on his behalf in any matter pertaining to the present suit. Sitts responded in the negative, "reserv[ing] the right to amend his response to this interrogatory in the event that an expert witness who is expected to testify at trial is subsequently retained." No amendment to this interrogatory answer was ever served.

In November 1985, after having made periodic inquiries as to the progress of the case, the district court issued a scheduling order that required that all remaining pretrial discovery be concluded by March 14, 1986. A pretrial conference was scheduled for April 18, 1986, and the parties were directed to file prior to that conference a stipulation containing, *inter alia*, "a list of all witnesses who will be called at the trial and a brief summary of the testimony to be given by each witness."

By notice of motion dated March 18, 1986, and returnable on the date of the scheduled pretrial conference, the United States moved for summary judgment dismissing the complaint. The ground of the motion was that New York law requires that, in order to establish a prima facie case of medical malpractice, a plaintiff must produce expert testimony on the issues of negligence and causation, and that Sitts had not identified, formally or informally, any such expert who would testify on his behalf at trial. Sitts opposed the motion by arguing that summary judgment could not be granted on a motion supported solely by an attorney's affidavit, that there plainly existed issues of fact, and that his case was of the type that New York law permits to be tried without expert testimony since, in his view, there could be no question that the performance of an operation at the wrong site constituted negligence.

Sitts also asserted that further discovery in the form of interrogatories or a deposition of Dr. Paul DiMartino—the surgeon who performed the 1979 operation on Sitts—was necessary to permit a fair and just resolution of the case. In reply, defendant's attorney submitted, *inter alia*, an April 3, 1986 letter addressed to her

from Dr. DiMartino which stated, in pertinent part, as follows:

> Upon review of Mr. Kenneth Sitts [*sic*] hospital records and x-rays, my opinion is that the surgery performed on 30 November 1978 was done at a level other than indicated by his myelogram. This I feel was performed due to the variation of normal anatomy Mr. Sitts has and is not uncommon.
>
> What distresses me is that on various phone conversations from different attorneys, I am attributed to informing Mr. Sitts that the surgery performed was negligent. I deny that allegation.... I have not expressed to him or anyone else that this was negligent.

After hearing oral argument, the court granted the United States' motion for summary judgment, rejecting Sitts's contention that simply because the operation was performed at the wrong level of the spine the question of negligence was within the realm of experience of ordinary citizens:

> I do think that this is a case that would need expert medical testimony and, therefore, since the burden is upon the Plaintiff to show that they could make out a prima facie case and they have produced, in my opinion, no evidence whatsoever that the Government was negligent, I am going to grant the motion for summary judgment made by the Government at this time based upon all of the papers that have been filed and the arguments that I have heard today; summary judgment is granted.

The court denied Sitts's request for further delay, stating that Sitts apparently had not diligently pursued Dr. DiMartino, that it did not appear that Dr. DiMartino's testimony would establish Sitts' prima facie case, and that no reason had been offered for Sitts's failure to retain an expert other than Dr. DiMartino.

Judgment was entered dismissing the complaint, and this appeal followed.

## II. DISCUSSION

On appeal, Sitts pursues his contentions that his case is one in which expert medical testimony need not be presented and that defendants' moving papers were inadequate to support summary judgment. We find no merit in either argument.

### A. The Requirement that Expert Medical Testimony Be Presented

It is well established in New York law that "unless the alleged act of malpractice falls within the competence of a lay jury to evaluate, it is incumbent upon the plaintiff to present expert testimony in support of the allegations to establish a prima facie case of malpractice." *Keane v. Sloan-Kettering Institute for Cancer Research,* 96 A.D.2d 505, 506, 464 N.Y.S.2d 548, 549 (2d Dep't 1983); *see, e.g., Alvarez v. Prospect Hospital,* 68 N.Y.2d 320, 327, 508 N.Y.S.2d 923, 927, 501 N.E.2d 572, 576 (1986); *530 East 89th Corp. v. Unger,* 43 N.Y.2d 776, 777, 402 N.Y.S.2d 382, 383, 373 N.E.2d 276, 277 (1977) (unless the act of malpractice is within a layman's competence to evaluate, "[i]t is incumbent upon the plaintiff to present expert testimony to support allegations of malpractice ...") (architectural malpractice case citing *McDermott v. Manhattan Eye, Ear & Throat Hospital,* 15 N.Y.2d 20, 24, 255 N.Y.S.2d 65, 69, 203 N.E.2d 469, 471 (1964), and cited in other medical malpractice decisions such as *Koehler v. Schwartz,* 48 N.Y.2d 807, 809–10, 424 N.Y.S.2d 119, 120, 399 N.E.2d 1140, 1141 (1979)).

A physician's obligations to his patient are to possess at least the degree of knowledge and skill possessed by the average member of the medical profession in the community in which he practices, to exercise ordinary and reasonable care in the application of that professional knowledge and skill, and to use his best judgment in the application of his knowledge and skill. In order to show that the defendant has not exercised ordinary and reasonable care, the plaintiff ordinarily must show what the accepted standards of practice were and that the defendant deviated from those standards or failed to apply whatever superior knowledge he had for the plaintiff's benefit. *Toth v. Community Hospital at*

*Glen Cove,* 22 N.Y.2d 255, 262–63, 292 N.Y.S.2d 440, 447, 239 N.E.2d 368, 372 (1968); *Monahan v. Weichert,* 82 A.D.2d 102, 105–06, 442 N.Y.S.2d 295, 297 (4th Dep't 1981). The requirement that the plaintiff introduce expert medical testimony is imposed in part because "without expert assistance a jury will often have no understanding of what constitutes reasonable behavior in a complex and technical profession such as medicine." *Paul v. Boschenstein,* 105 A.D.2d 248, 249, 482 N.Y.S.2d 870, 872 (2d Dep't 1984). The requirement is no less applicable in a case that is tried to the court without a jury. *See Charlton v. Montefiore Hospital,* 45 Misc.2d 153, 155, 256 N.Y.S.2d 219, 222 (Sup.Ct. Queens Co. 1965).

New York law recognizes the possibility that a deviation from a proper standard of care may be so clear and obvious that it will be within the understanding of the ordinary layman without the need for expert testimony. For example, where a dentist has pulled the wrong tooth, *see Wenger v. Mollin,* 264 N.Y. 656, 191 N.E. 611 (1934), or where an unexplained injury has occurred to a part of the body remote from the site of the surgery, *see Acosta v. City of New York,* 67 Misc.2d 756, 763, 324 N.Y.S.2d 137, 144–45 (N.Y.Civ.Ct.1971) (dictum), expert testimony is not needed for the establishment of the plaintiff's prima facie case. *See also* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 32, at 189 (5th ed. 1984) ("where the surgeon saws off the wrong leg, or there is injury to a part of the body not within the operative field, it is often held that the jury may infer negligence without the aid of any expert") (footnotes omitted). Even where it might initially appear that the matter would be within the trier's ordinary competence, however, as where, for example, the surgeon left a needle inside the patient's body, if the defendant can proffer any evidence to support the view that a proper standard of care was followed, the plaintiff cannot prevail without introducing expert medical testimony. *See Benson v. Dean,* 232 N.Y. 52, 57–58, 133 N.E. 125, 127 (1921).

Further, even where negligence is easily within the layman's realm of knowledge and hence properly provable without expert testimony, expert testimony may be required to prove that the negligence was the proximate cause of the injury complained of, for

"[a]lmost every person who receives the services of a physician is sick or disabled when he first goes to the physician. Thus there lurks the ever present possibility that it was the patient's original affliction rather than the physician's negligence which caused the ultimate damage." (1 Louisell and Williams, Medical Malpractice, par 8.07, p 213.).

*Monahan v. Weichert,* 82 A.D.2d at 107, 442 N.Y.S.2d at 298. Thus, in *De Falco v. Long Island College Hospital,* 90 Misc.2d 164, 172, 393 N.Y.S.2d 859, 862 (Sup.Ct., Kings Co. 1977), the court held that negligence was adequately proven without expert medical testimony where a soiled bandage had been applied to the plaintiff's eye that had recently undergone surgery, but that expert testimony was needed to establish that the application of the soiled bandage caused the plaintiff's subsequent infection.

In sum, in the view of the New York courts, the medical malpractice case in which no expert medical testimony is required is "rare." *See Charlton v. Montefiore Hospital,* 45 Misc.2d at 155, 256 N.Y.S.2d at 222.

Where such evidence is not proffered, the defendant is entitled to judgment as a matter of law, whether by means of a judgment notwithstanding a jury verdict in favor of the plaintiff, *see De Falco v. Long Island College Hospital,* or dismissal of the case at the close of the plaintiff's evidence, *see Charlton v. Montefiore Hospital,* or dismissal after an offer of proof where the plaintiff states that no expert medical evidence will be presented, *see Macey v. Hassam,* 97 A.D.2d 919, 920, 470 N.Y.S.2d 761, 762 (3d Dep't 1983), or the granting of a motion for summary judgment in opposition to which the plaintiff fails to come forward with such evidence,

*see Goodman v. Emergency Hospital,* 96 Misc.2d 1116, 1117–18, 410 N.Y.S.2d 511, 512 (Sup.Ct., Erie Co. 1978). *See also Alvarez v. Prospect Hospital,* 68 N.Y.2d at 327, 508 N.Y.S.2d at 927, 501 N.E.2d at 576 ("in order to defeat defendant's motion for summary judgment," which was based on hospital records and defendant's deposition testimony, "some statement of expert medical opinion was required to demonstrate the viability of the new theory of liability hypothesized by plaintiff's counsel. . . .") (citations omitted). As the *Goodman* court stated in granting summary judgment,

> for plaintiff to resist this motion, it is incumbent upon her to produce a statement from an expert which would deny defendants' contention that their treatment was in accord with accepted medical standards in this professional community. This proof is necessary to support her conclusory allegation of a deviation from such standards and that the deviation proximately caused her injuries. Especially so here where the defendants have come forward and presented prima facie proof that plaintiff's claim is without merit.

96 Misc.2d at 1117–18, 410 N.Y.S.2d at 512.

In the present case, we see no error in the district court's ruling that New York's general rule applies and that, especially in light of the deposition testimony of the orthopedic surgeons suggesting that accepted medical practices were followed in the 1978 operation, Sitts would be required to present expert medical testimony at trial to establish a prima facie case of medical malpractice. While it is conceded by defendant that that operation was performed at the "wrong" level of the spine, this does not of itself establish that the operation was negligently performed, for the case does not concern such organs as those that come in pairs, one on each side of the body, or those that are easily visible such as teeth, which anyone would be expected to identify without difficulty. Rather, it is evident from the orthopedists' pretrial description of the standard method of locating the various vertebrae of the spine that

that procedure is not visual or simple. It cannot reasonably be thought that either these procedures or the normal anatomical considerations that underlie them are within the common knowledge of ordinary lay persons. Nor could a lay trier of fact reasonably be expected, without expert assistance, to know the degree to which lumbarization at the S1–S2 level is rare, the degree to which Sitts had such lumbarization, and the degree to which lumbarization complicates the surgical procedure, or to know whether preoperative procedures should have revealed such lumbarization to the VA surgeons. Further, given the fact that bulging material was removed from S1–S2 in the 1978 operation and the fact that there was deposition testimony that back patients often are required to undergo spinal surgery more than once, we doubt that a lay person would be equipped to judge, without expert assistance, whether the pain and suffering complained of by Sitts would have been avoided if the 1978 operation had been performed at L5–S1, or whether instead, further surgery would then have been required for the removal of the bulging material at S1–S2.

In sum, this is not, as plaintiff would have it, the rare case in which a prima facie case of medical malpractice may be established without the presentation of expert medical testimony.

### B. *The Propriety of Summary Judgment*

Sitts's contention that the court could not properly grant summary judgment on the basis of the motion below is premised principally on the rule that the affidavit of an attorney is normally inadequate, of itself, to show the absence of genuine issues of material fact to be tried, *see, e.g., Beyah v. Coughlin,* 789 F.2d 986, 989–90 (2d Cir. 1986). Sitts's reliance, however, is misplaced.

The rule that an attorney's affidavit alone is insufficient to support a motion for summary judgment has its principal applicability when the dispositive facts as to

which the moving party contends there is no genuine issue are historical facts relating to the events leading to the lawsuit, for the attorney usually lacks the requisite personal knowledge of these facts. *See* Fed. R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge ... and shall show affirmatively that the affiant is competent to testify to the matters stated therein."). In the present case, however, the material fact upon which the United States' summary judgment motion was premised was a procedural fact that was within the personal knowledge of the attorney, supported by the pretrial discovery materials of record in the case. Thus, the United States' motion met the requirements of Rule 56(e).

■ As to the fact underlying the United States' motion, *i.e.,* that Sitts had no medical expert who would testify for him at trial, there plainly was no genuine issue. Sitts's interrogatory answers in 1983 indicated that he had retained no such expert; he did not amend those answers to identify such an expert before the court-imposed deadline of March 14, 1986, for the completion of discovery; and he did not thereafter come forward with the name of any such expert either for the list of his trial witnesses that was due prior to April 18, 1986, or as part of his opposition to the motion for summary judgment. The district court properly found that, under the applicable principles of substantive law, Sitts's failure to have such an expert was dispositive, requiring the entry of judgment in favor of defendant as a matter of law.

Sitts's contention that summary judgment should not have been granted because the United States' motion did not demonstrate "that there had been no medical malpractice in this case" evinces a lack of understanding as to the role of summary judgment. Though Rule 56(c) states that summary judgment shall be granted if "there is no genuine issue as to *any* material fact" (emphasis added), where there is no genuine issue as to the existence of a fact that dispositively entitles the moving party to judgment as a matter of law, all

other facts become immaterial. *See, e.g., Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Thus, in the present case, notwithstanding the existence of genuine questions as to whether the VA physicians were negligent and, if so, whether that negligence caused the injury complained of, these issues were no longer material in light of Sitts's failure to identify any medical expert who could establish his prima facie case at trial.

■ Finally, we are unable to see that the district court abused its discretion in declining to grant an extension of time for Sitts to retain a medical expert. First, it is noteworthy that in seeking an extension, Sitts did not ask that he be given time to locate an expert, but only that he be given time to depose Dr. DiMartino. By the time this request was made, the case had been pending for nearly six years. The court had repeatedly sought status reports from the parties, and Sitts had listed Dr. DiMartino as a discovery target as early as February 1983; the United States had provided Sitts with his last known address in March 1983; Sitts's counsel did not contact Dr. DiMartino until January 1986. And, although by the time Sitts's counsel talked with Dr. DiMartino the court had already imposed a discovery deadline of March 14, 1986, apparently no effort was made to serve interrogatories or to schedule a deposition.

In the circumstances, it is difficult to quarrel with the district court's assessment that Sitts's pursuit of discovery from Dr. DiMartino had not been diligent. Nor, given Dr. DiMartino's letter denying that he had ever said there was any negligence, can one quarrel with the district court's assessment that discovery from Dr. DiMartino seemed unlikely to lead to evidence that could establish Sitts's prima facie case.

Simply put, the situation was that Sitts, whose counsel was experienced in medical malpractice litigation (we note, for example, that the firm represented the defendant hospital in *Monahan v. Weichert,* 82 A.D.2d 102, 442 N.Y.S.2d 295, discussed above), had neither identified nor proffered

any likelihood that he could identify any expert who would testify that the 1978 operation had been negligently performed. We see no abuse of discretion in the district court's refusal, in these circumstances, to grant the request for more time.

## CONCLUSION

The judgment of the district court dismissing the complaint is in all respects affirmed.