**Michael SCHUNK, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 87–CV–1047 (TCP).**

United States District Court,
E.D. New York.

Jan. 2, 1992.

Pamela R. Perron, Asst. U.S. Atty., of counsel to Andrew J. Maloney, U.S. Atty., E.D.N.Y., Brooklyn, N.Y., for plaintiff.

Glenn L. Stephenson, Seaford, N.Y., for defendant.

PLATT, Chief Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### INTRODUCTION

This matter came on for trial May 1, 1990, upon the complaint of Michael Schunk, a Vietnam veteran. Plaintiff claims that, between 1979 and 1985, doctors at the Veterans Administration Medical Centers in Long Beach, California ("Long Beach VA") and in Northport, New York ("Northport VA") committed medical malpractice by failing to diagnose properly the cause of his chronic headaches and pain before prescribing benzodiazepines [1] and narcotic analgesics in such a manner that plaintiff "might" have become addicted to them. *See* Testimony of Dr. Bernard Salzman, RII:12–14.[2] Plaintiff further claims that if the VA did not cause his addictions, the VA improperly perpetuated them. *See id.* Pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–80, he seeks damages of more than $1 million. *See* Proposed Joint Pre-trial Order, at ¶ II(b)–(c).

Plaintiff filed an administrative claim dated March 24, 1986 in which he complained that the "Veterans Administration Hospital [sic] prescribed tylox continually at sufficient doses to cause addiction by the claimant without notice of risks involved. Permanent emotional trauma." Original Complaint, App. 1.

Plaintiff filed his original complaint herein on April 6, 1987, and an amended complaint on February 21, 1989. In paragraphs 5 and 6 of the amended complaint, plaintiff alleges that while being treated on both an in-patient and out-patient basis at the Veteran Administration Hospitals in Long Beach, California (June, 1979 through November, 1982) and Northport, New York (December 1982 through September, 1985), plaintiff was negligently prescribed numerous narcotic analgesics and tranquilizers in such quantities as to addict plaintiff to these drugs. *See* Amended Complaint, ¶¶ 5, 6.

At trial, the United States renewed its motion to dismiss plaintiff's claims of malpractice against the Long Beach VA 1979–1982 and all allegations concerning medications other than tylox, on the grounds that plaintiff failed to exhaust his administrative remedies and that, in any event,

---

1. Benzodiazepines are a group of tranquilizers. The benzodiazepines plaintiff specifically objected to at trial were valium, librium, serax, xanax, and dalmane.

2. References to the trial record are noted herein as "R" followed by the volume number and pertinent page numbers. The volumes are identified as follows:

    I . . . . . . .May 1, 1990
    II . . . . . .February 21, 1991
    III . . . . .February 28, 1991
    IV . . . . .March 7, 1991
    V . . . . . .March 13, 1991.

such claims are barred by the two-year statute of limitations. *See* 28 U.S.C. §§ 2675(a), 2401(b). These motions are now granted. Upon the entire record, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a).

## FINDINGS OF FACT

A. *Plaintiff's Prior Medical History: 1968–1979*

1. Prior to his treatment at the VA hospitals, plaintiff had a long history of drug and other substance abuse.

2. As a teenager, plaintiff smoked marijuana and drank alcohol excessively. *See* Schunk, RI:46, 48; Pltf's Ex. 1, at 38–39.

3. While serving in the United States Air Force from 1969 to 1971, plaintiff smoked opium at least once and marijuana several times. He also had numerous experiences with cocaine and hallucinogens such as LSD. *See* Schunk, RI:50, 52; Pltf's Ex. 1, at 38; Pltf's Ex. 3, at 115A.

4. Plaintiff reported to a psychiatrist in 1971 that he had had to stop drinking in 1970 because of blackouts. *See* Pltf's Ex. 1, at 38. Nevertheless, plaintiff resumed drinking alcohol while he was still in the military service. *See* Schunk, RI:45, 50–51.

5. Plaintiff also began smoking cigarettes in the service. *See id.* at 50.

6. While he was in the military, plaintiff was in three motorcycle accidents. *See id.* at 40–41. He began to experience headaches, as well as pain in his spine, joints and hands. *See* Pltf's Ex. 1, at 26, 42, 54, 55, *et passim.*

7. For the first time, he was prescribed codeine, a narcotic analgesic derived from opium. *See* Schunk, RI:40; Dr. Robert Derman, RV:41.

8. In addition, because he felt "nervous," plaintiff went to the dispensary to obtain valium, which he took for at least two months. *See* Schunk, RI:42–43. Other prescription drugs plaintiff took during this period included librium for "shakiness," darvon (a synthetic form of codeine) for lower back pain, and parafon forte, a muscle relaxant for shoulder pain. *See* Pltf's Ex. 1, at 26–27, 51–52; Schunk, RI:39–45; Derman, RII:82.

9. Plaintiff began talking to the walls. *See* Schunk, RI:44.

10. His commanding officer ordered him to see a psychiatrist. *See id.* at 53.

11. In 1971, he was admitted to an Air Force Base hospital for a three-month psychiatric evaluation. *See id.* at 53–54. The official medical chart from that time records a discharge diagnosis of "drug-induced psychosis and schizoid personality." Pltf's Ex. 1, at 39.

12. After his discharge from the Air Force in August 1971, plaintiff remained unemployed for one year. He drank beer, vodka or "anything he could obtain," as much as he could, from the time he awoke in the morning. He also took LSD at least twice. *See* Schunk, RI:56–57.

13. Plaintiff's headaches and pain persisted. *See* Schunk, RI:21, 58.

14. In 1973, a private physician in New York prescribed darvon after plaintiff fell off a ladder. *See* Deft's Ex. C, at 19.

15. By 1974, plaintiff was seeing a doctor who prescribed maximum strength ergot, a drug commonly used to treat migraine headaches. Plaintiff took this medication for one year. *See* Schunk, RI:21, 59–60; Derman, RII:85.

16. In 1975, he saw a neurologist in New York, Dr. Frederick Mendelsohn, who prescribed bellergal, another medication for migraine headaches. *See* Derman, RII:85–86.

17. Plaintiff's marriage dissolved and he quit his job in 1975. *See* Schunk, RI:60.

18. In the years that followed, plaintiff was terminated from subsequent jobs due to poor attendance and poor performance. Or he simply quit. *See id.* at 20, 71, 83–84; Derman, RII:114.

19. In 1978, plaintiff resolved to quit drinking and he moved to California to start a new life. *See* Schunk, RI:64–65.

20. There, he consulted a number of private physicians who, again, tried a series of medications, including caffergot, fiori-

nal, soma, librium, valium and codeine. *See* Pltf's Ex. 2, at 1. Of these, only the valium in the 10mg. dosage and codeine-derivative drugs proved effective. *See* Schunk, RI: 65–66.

21. However, none of plaintiff's private doctors were able to diagnose the cause of his headaches. *See id.* at 71–72.

22. The Court finds that during the period 1969 to 1979 plaintiff became habituated to alcohol and various forms of drugs unrelated to any kind of medicine administered by the Veteran's Administration Hospital.

B. *Treatment at the VA Hospital in Long Beach, California: June 1979 through November 1982*

23. On June 25, 1979, plaintiff visited the emergency room at the Long Beach VA in California. He complained of headaches and demanded pain medication immediately. *See* Pltf's Ex. 2, at 1; Schunk, RI:74, 79.

24. When the hospital staff would not dispense medication but suggested instead a medical work-up for the headaches, plaintiff threatened to throw a metal file box in the intake nurse's face, telling her, "I don't want to be a guinea pig to this bureaucracy, bitch." Pltf's Ex. 2, at 1–2; Schunk, RI:76–77.

25. The next day, plaintiff telephoned the Long Beach VA and asked if the VA had percodan, a narcotic analgesic. *See* Pltf's Ex. 2, at 3; Derman, RII:87. Plaintiff was advised to have a neurological work-up and an electroencephalograph (EEG). He refused to undergo any tests and refused to reveal what medications he had taken in the past. *See* Pltf's Ex. 2, at 3.

26. There is no certified record from the Long Beach VA other than the emergency room records.

27. Plaintiff having never filed an administrative claim with respect to treatment in California, the complete chart is not available ten years later.

28. The few progress notes which remain suggest that plaintiff was treated in one of the Long Beach VA outpatient clinics on a monthly basis from June 20, 1979 to November 9, 1982. *See* Pltf's Ex. 3, at 143–48.

29. Doctors prescribed tylenol with codeine "gr ss," a medical notation for "grains one-half," or 30 mg. codeine. This is a pain reliever commonly called tylenol #3. *See id.;* Derman, RII:96.

30. The doctors also gave plaintiff valium in 5 to 10mg. doses, or another benzodiazepine, as a muscle relaxant. *See* Pltf's Ex. 3, at 143–48; Derman, RII:96, 104–05.

31. These valium and tylenol #3 prescriptions did in fact reduce plaintiff's headaches. *See* Schunk, RI:24. But none of the prescriptions by Long Beach VA doctors were excessive. *See* Derman, RII:105, 111.

32. Plaintiff saw at least two private physicians while he was under the Long Beach VA's care.

33. From approximately May 1981 through June 1982, he saw Dr. Braitsch, a general practitioner. Dr. Braitsch prescribed 100 valium 10mg. at a time and 100 codeine pills to last one or two months. *See* Schunk, RI:66–67.

34. A blood test run in January 1981 by Dr. Braitsch shows elevated hemoglobin values which suggest excessive alcohol consumption by plaintiff over a long period of time. *See* Pltf's Ex. 3, at 149; Derman, RII:103.

35. Another of his private doctors also prescribed tylox. *See* Pltf's Ex. 3, at 15B.

36. Tylox consists of tylenol combined with approximately 5mg. oxycodone, a synthetic form of codeine. Tylox is manufactured in only this one strength.

37. One milligram of oxycodone has the same analgesic effect as six milligrams of codeine; thus, 5mg. oxycodone is as potent as 30mg. codeine.

38. Stated another way, one tylox pill is the equivalent of one tylenol #3. Both tylox and tylenol #3 are considered moderate strength pain relievers. *See* Derman, RII:100–101, RIII:72, RIV:69–70.

C. *Treatment By Dr. Diefenbach: November 1982–1989*

39. In 1982, plaintiff lost his last job in California and remained unemployed for several months. *See* Schunk, RI:80–81.

40. In November 1982, he returned to New York. He consulted another private physician, the late Dr. William Diefenbach, a well-reputed internist. *See* Deft's Ex. C (deposition of Dr. William Diefenbach); Derman, RIV:59.

41. For seven years, 1982–1989, Dr. Diefenbach saw plaintiff almost every month. *See* Derman, RIV:58.

42. He regularly prescribed for plaintiff valium 10mg., one pill to be taken every four hours for anxiety, as needed.

43. In addition, Dr. Diefenbach occasionally prescribed tylox, but more often tylenol, fiorinal, or ascriptin with codeine for plaintiff's headaches.

44. Many of these prescriptions were refillable up to four times. *See* Deft's Ex. A, at 1, 4, 6, 7, 19–21.

45. Dr. Diefenbach was never able to diagnose the cause of plaintiff's headaches or joint pain. *See* Derman, RIV:58–59.

46. Nevertheless, he believed plaintiff needed medication and could not function without it. *See* Deft's Ex. C, at 61–62.

47. He routinely treated plaintiff's anxiety with 40mg. valium per day. *See* Deft's Ex. A, at 2–9, 11, 14–23.

48. Dr. Diefenbach tried "regularly" to wean plaintiff off the valium, but it was difficult because, as Dr. Diefenbach stated, plaintiff "needed what he was taking, [and] he certainly couldn't function without some medication." Deft's Ex. C, at 61.

49. For example, Dr. Diefenbach tried to reduce the amount by prescribing only 50 valium 5mg. But less than a week later, he had to increase the medication back to 100 valium 10mg. *See* Deft. Ex. A, at 7 (*compare* rxs dated Feb. 6 *and* Feb. 11, 1984).

50. Additional attempts to reduce plaintiff's valium intake are illustrated in the private pharmacy records. *See id.* at 14, 16.

51. Dr. Diefenbach also tried to substitute milder medications such as buspar or meprobamate, or another benzodiazepine such as xanax, but they were not as effective. *See id.* at 22; Derman, RIV:59–60.

52. These attempts were never successful for any length of time, and Dr. Diefenbach found it necessary to prescribe valium as recently as September 1989. *See* Deft's Ex. C, at 120.

53. From 1982 until his death in 1990, Dr. Diefenbach also prescribed medications containing 30mg. codeine on a regular basis.

54. In the beginning, Dr. Diefenbach maintained plaintiff on a fairly consistent dosage of one pill every four hours, or approximately 120mg. per day. *See* Deft's Ex. A, at 1–2; Deft. Ex. E, rx ## 1–12.

55. On May 20, 1983, Dr. Diefenbach increased plaintiff's daily dosage of codeine to two pills every four hours, or 240mg. per day. *See* Deft. Ex. A, at 3; Deft. Ex. E, rx ## 13–20.

56. Dr. Diefenbach attempted to diminish the amount, but he was unsuccessful and raised the dosage back to 240mg. per day through March 7, 1984. *See* Deft's Ex. E (*compare* rx # 21 *with* rx ## 22–34); Deft's Ex. A, at 6.

57. Dr. Diefenbach did not write a codeine prescription for the month of April 1984 because plaintiff had been admitted to the Northport VA as an inpatient. Almost immediately upon plaintiff's release, however, Dr. Diefenbach resumed prescribing tylenol # 3 at 120mg. per day. *See* Deft's Ex. A, at 9–10; Deft's Ex. E, rx ## 35–40.

58. Dr. Diefenbach soon increased plaintiff's codeine intake to 240mg. per day as of September 1, 1984. *See* Deft's Ex. E, rx # 37; Deft's Ex. A, at 10.

59. He tried to diminish the amount, but plaintiff used up the pills too quickly. Therefore, Dr. Diefenbach had to increase the dosage again to 240mg. per day in October 1984. *See* Deft's Ex. E (*compare* rx ## 38–39 *with* rx ## 40–43); Deft's Ex. A, at 10–12.

60. Except for the summer months June–August 1985, Dr. Diefenbach continued to prescribe codeine-based medications for plaintiff once or twice a month until June 1986. *See* Deft's Exs. A, B, and E, rx ## 38–71.

61. Until his death in 1990, Dr. Diefenbach continued to prescribe for plaintiff, but the exact number of pills are unknown.

### D. *Treatment at the Northport VA: November 1982–1985*

62. For part of the time he was being treated by Dr. Diefenbach, plaintiff was also seeing doctors at the Northport VA.

63. On November 23, 1982, he appeared at the emergency room complaining of recurrent headaches over the past ten years. He reported that he had been taking tylenol with codeine, valium, and aspirin. A doctor performed a physical examination, but plaintiff refused to undergo an EEG. The doctor was unable to determine the source of the headaches and therefore referred plaintiff to the medical clinic for complete work-up. No medications were prescribed on that occasion. *See* Pltf's Ex. 3, at 14A–B.

64. Plaintiff was seen at the medical clinic two days later. He stated that he had been exposed to toxic chemicals and/or herbicides in Vietnam. Accordingly, he was referred to the herbicide, rheumatology and orthopedic clinics for evaluation of his joint pains. *See id.* at 45, 64, 66.

65. Eschewing these evaluations, plaintiff returned to the emergency room on December 6, 1982. He said he "felt like killing somebody" and asked to speak with a psychiatrist. After another physical examination, a psychiatrist offered to admit him for inpatient treatment, but plaintiff refused. *See id.* at 15A–B.

66. The doctor's tentative diagnosis at that time was "rule out schizophrenia, paranoid type; diffuse pain, etiology unknown." *Id.*

67. Plaintiff explained that he had come to the VA because he could not afford to renew the tylox and valium prescriptions that he had been getting from Dr. Diefenbach. The emergency room doctor gave plaintiff tolectin and mellaril, but no benzodiazepines or analgesics. Tolectin is a mild anti-inflammatory and mellaril is a tranquilizer. He then referred plaintiff to the mental health, orthopedic, herbicide, and medical clinics. *See id.* at 61.

68. The work-up that followed included x-rays of plaintiff's head, chest, spine, and hands, blood chemistries, urinalysis, an electrocardiogram (EKG), and another physical examination. *See id.* at 1–11.

69. Before all the results were in, plaintiff reappeared at the emergency room on December 22, 1982, complaining of pain throughout his body and asking for medicine for the pain, *i.e.*, his current medications, valium and tylenol # 3. However, plaintiff became upset when staff ordered laboratory tests, and he walked out before any could be performed. *See id.* at 16A–B.

70. On the same day, plaintiff went to the outpatient psychiatric department. The psychiatrist there noted plaintiff's angry, distrustful attitude and suggested psychotherapy. Plaintiff refused, saying he just wanted treatment for his pains. The doctor discussed with plaintiff his potential dependency upon medication and suggested he be hospitalized for detoxification. Again, plaintiff refused. The psychiatrist issued a one month prescription for 120 valium 10mg., one tablet four times a day, exactly what Dr. Diefenbach had been giving. *See id.* at 21A–B.

71. A week later, plaintiff went to the VA medical clinic to ask for a tylox refill. The doctor explained that tylox may be habit-forming before he prescribed just enough tylox to last ten days. *See* Pltf's Ex. 3, at 22, 52.

72. Similarly small prescriptions of tylox were prescribed on January 1, 1983 (enough for 6.5 days) and February 14, 1983 (enough for thirteen days). *See* Pltf's Ex. 8, bottle # 493; Ex. 3, at 51.

73. These small amounts could not have caused plaintiff to become physically addicted to tylox, if he took the pills as directed. *See* Derman, RV:55.

74. After February 14, 1983, the Northport VA prescribed no tylox or any other codeine-based medication for plaintiff until March 13, 1984. Dr. Diefenbach was plaintiff's only known source of these drugs during those thirteen months. *See* Pltf's Ex. 3 (*compare* 51 *with* 81); Deft's Ex. E (*compare* rx ## C, D *with* rx ## 8–33).

75. From 1982 through 1984, plaintiff continued visiting the outpatient psychiatric department on a monthly basis for treatment of anxiety. *See* Pltf's Ex. 3, at 23–25, 31–33, 35–49.

76. The VA physicians gave plaintiff prescriptions of 120 valium 10mg., one pill to be taken four times a day. *See id.* at 53–55.

77. Valium prescriptions at the VA were not refillable. *See* Derman, RII:143.

78. And each prescription contained only enough pills for one month; thus, plaintiff had to return and be seen by a doctor in order to renew his prescription. The Long Beach and Northport VA outpatient clinics never authorized more than 120 valiums, thirty days worth, in one prescription. *See* Pltf's Ex. 3, at 51–60, 143–48, 210–13.

79. The doctors advised plaintiff to cut down his valium intake, then, pursuant to a nation-wide policy change, the VA ceased dispensing valium on an outpatient basis altogether. *See* Derman, RIII:13.

80. Thereafter the VA doctors gave plaintiff 30–day prescriptions of other benzodiazepines, such as librium, xanax, serax and dalmane. Between May 1983 and February 1984, plaintiff received only four such prescriptions. *See* Pltf's Ex. 3, at 56–58.

81. On March 13, 1984, plaintiff presented at the Northport VA with clear—but as later developed, transient—signs of psychosis. He was hallucinating, expressing grandiose and magical ideas, saying he could fly and catch lightning. These symptoms warranted his admission to the psychiatric ward. Doctors noted a tentative diagnosis of schizophrenia, schizotypal personality disorder, a bipolar disorder or perhaps herbicide exposure. *See* Pltf's Ex. 3, at 104A–B, 108A–B.

82. Initially, plaintiff refused the routine admission work up, *see id.* at 81, 180, but several days later he relented. An exhaustive work up was performed, including x-rays, CT scan, rheumatology, blood, thyroid and syphilis tests, EEG, and a dental exam. *See id.* at 81–88, 161, 164–67, 180.

83. A neurologist examined him and concluded that the patient had no structural lesion or seizure disorder, but that he possibly had migraine headaches. *See id.* at 89A–B.

84. While an inpatient, plaintiff was maintained on the same medicine he had been receiving from Dr. Diefenbach, approximately 240 mg. codeine and 40mg. valium per day. *See id.* at 76A, 81.

85. A psychiatric treatment team consisting of a psychiatrist, a nurse, a social worker, as well as personnel from rehabilitation medicine and dietetics developed a treatment plan for plaintiff. *See* Derman, RIII:55.

86. The team monitored plaintiff closely and counselled him frequently. *See* Pltf's Ex. 3, at 91–103.

87. During this observation period, plaintiff's psychiatrist noted that the patient had been taking codeine and valium chronically, and that he was "quite resistant to their discontinuation." *Id.* at 118.

88. Eventually, the psychotic episodes abated, and as his psychiatrist recorded, plaintiff did not exhibit the necessary elements of schizophrenia or of a bipolar disorder. *See id.* at 117A.

89. All the tests were completed. However, no cause for plaintiff's headaches and pains could be found. Because there was no reason to keep plaintiff in the hospital any longer, he was discharged on April 12, 1984 with a diagnosis of schizotypal personality disorder and atypical headaches and joint pains. *See id.*

90. After discharge, plaintiff resumed his monthly visits to the outpatient psychiatric department. The VA drew up a formal treatment plan for plaintiff that includ-

ed lowering tylox to six pills a day with a view to tapering. *See id.* at 184–86.

91. On May 30, 1984, tylox prescription was reduced to six pills, or the equivalent of 180 mg. codeine per day. *See id.* at 210.

92. Plaintiff tried to convince the VA staff to give him more tylox, first by pleading that he could not work without it and later becoming angry when any increase was denied. *See id.* at 190–91, 193.

93. The following year, while his psychiatric treatment continued, plaintiff was re-evaluated by an orthopedist and a rheumatologist. *See id.* at 176, 202–03, 206, 213.

94. His laboratory tests and x-rays were up-dated too. *See id.* at 161–63, 165, 167b–c.

95. The VA doctors advised plaintiff that they intended to reduce his tylox further and warned him about drug dependency. *See id.* at 199–201.

96. One of his psychiatrists reiterated the option of inpatient detoxification, but plaintiff refused. *See id.* at 207.

97. On June 20, 1985, the VA prescribed tylox for the last time. *See id.* at 214. The VA has prescribed no tylox or codeine-based medications since then.

98. Plaintiff has never sought detoxification at the VA or at any other state-funded or private institutions. *See* Schunk, RI:102.

99. To this day, six years after the last prescription from the VA, plaintiff is still taking codeine-based medication. *See id.* at 37.

E. *The Experts' Evidence*

100. Dr. Bernard Salzman, a psychiatrist, testified in behalf of the plaintiff.

101. He opined that the VA hospitals deviated from the accepted standard of medical practice by failing to arrive at a clear cut diagnosis and by prescribing benzodiazepines and analgesics in a manner he described as "irresponsible."

102. Dr. Salzman was of the opinion that the use of analgesics on a long-term basis was improper, and that plaintiff should not have been given what he termed "open-ended, unsupervised" prescriptions to a patient who was known to be unstable and previously alcoholic. *See* Salzman, RII:13–14, 19–20.

103. Plaintiff presented no proof at trial to support his allegation that he was exposed to toxic chemicals in the military, that such exposure caused him some injuries, and that the VA mistreated those injuries. *See* Amended Complaint, ¶¶ 13–17.

104. The Court does not credit the opinion of Dr. Salzman for several reasons.

105. First, Dr. Salzman failed to identify the standard from which the VA deviated. There was such a lack of standards in prescribing valium that in 1990 the State of New York began to enforce new regulations requiring triplicate prescription pads. *See* Salzman, RII:30. But that was five years after the VA last treated plaintiff.

106. Doctor Salzman failed to explain what the VA should have done, other than to perform a complete medical and psychiatric work up. *See id.* at 22, 35. Doctor Salzman claimed that the VA prescribed the "wrong" medication; but he failed to identify the correct medication, if any. *See id.* at 23–24.

107. He conceded that psychiatric treatment is a "contract" between doctor and patient, and that this patient failed to comply with the contract by preventing a complete work up, by refusing psychiatric treatment and detoxification. *See id.* at 42–43.

108. Second, Dr. Salzman agreed that diagnoses in the field of psychiatry may vary over time because the patient may present differently from one day to the next. Especially in a patient who has a personality disorder, stress may cause signs of psychosis and schizophrenia to emerge. *See id.* at 36–38.

109. Based upon his interview with plaintiff in December 1990, Dr. Salzman diagnosed plaintiff as having a personality disorder of a mixed type, but he was unable to say when plaintiff first began to suffer from that condition. *See id.* at 11, 36.

110. This explains why the 1971 military diagnosis of "drug induced psychosis, schizoid personality" did not preclude the VA's impression in December 1982 of possible "schizophrenia." And the admitting diagnosis in March 1983 of possible "schizophrenia, personality or bipolar disorder," when plaintiff was experiencing auditory hallucinations, was not inconsistent with the discharge diagnosis in April 1984 of "schizotypal personality disorder."

111. As for diagnosing the etiology of plaintiff's headaches and pains, Dr. Salzman could not name the cause and had no opinion. *See* Salzman, RII:34.

112. None of the plaintiff's private physicians, including neurologists, were able to discover the source.

113. The VA's failure to diagnose the cause of these pains therefore constitutes no deviation from the applicable medical standard, particularly in light of plaintiff's efforts to thwart diagnosis.

114. The third and most striking aspect of Dr. Salzman's testimony was the fact that he seemed unaware of, or had never reviewed the evidence of the treatment by plaintiff's numerous private physicians. Plaintiff's expert never reviewed Dr. Diefenbach's deposition, the records of Drs. Braitsch, Mendelsohn and the Kaiser–Permanente clinic, or the prescriptions from Speed's, Barth's, Center Island and Bangston's pharmacies. *See id.* at 11–12.

115. Despite seventeen years of private prescriptions, Dr. Salzman did not seem to consider the other causative factors relating to plaintiff's alleged injuries.

116. Finally, with respect to establishing any injury, Dr. Salzman remained uncertain. He agreed that a major indicator of physical dependency is found in episodes of withdrawal. In other words, when a patient abstains from a given substance and suffers the symptoms of withdrawal, a doctor can ascertain whether the patient is physically addicted. *See* Salzman, RII:31–32.

117. Dr. Salzman admitted that plaintiff never suffered any withdrawal from benzodiazepines, thus it is questionable that he was ever addicted to the same. *See id.* at 38–39.

118. The one incident in early 1983, when the Northport VA substituted sinequan for valium, could not have been an episode of withdrawal as Dr. Salzman thought. *See id.* at 15–16. Dr. Diefenbach was regularly supplying plaintiff with 40mg. valium per day during the first three months of 1983. *Compare* Pltf's Ex. 3, at 35A–B *with* Deft's Ex. A, at 1.

119. Similarly, with respect to analgesics, Dr. Salzman conceded that before May 1984, he had no reason to believe that plaintiff suffered any physical dependency. *See* Salzman, RII:41.

120. After that date, there is no proof of a gap in the prescriptions or an episode of withdrawal.

121. Dr. Robert Derman, defendant's expert psychiatrist, testified unequivocally that neither of the VA hospitals deviated from accepted standards of medical practice regarding prescription of benzodiazepines and analgesics.

122. The Court accepts his opinion and finds that defendant committed no malpractice in treating the plaintiff.

123. Plaintiff was habituated to narcotic analgesics before he ever began treatment at the Long Beach VA. Dr. Derman explained that addiction, *i.e.*, physical dependency is distinguishable from habituation which is a psychological dependency. A person may be habituated, craving the drug and exhibiting drug-seeking behavior, yet not be physically addicted. *See* Derman, RIV:23.

124. The first day plaintiff appeared at the emergency room in California and attempted to manipulate the hospital staff to give percodan is evidence of a pre-existing psychological dependency on percodan, a narcotic analgesic, or its equivalent. *See* Derman, RII:89–90.

125. Dr. Derman further explained that there are some medical conditions that even a complete workup might not determine, for example, chronic fatigue syndrome. Nevertheless, when doctors can not name the condition, it is standard medical prac-

tice to help the patient symptomatically. *See id.* at 103–06.

126. Particularly in treating a patient suffering from subjective, chronic pain, the medical profession does not require a doctor to deny analgesics that, in fact afford some relief, simply because the physician judges the pain to be insufficient. A patient who continues to have pain will continue to need treatment. *See id.* at 108; Derman, RIV:19.

127. What the doctor must do in such cases is discuss with the patient the possibility of dependency and recommend discontinuance. That choice, however, can only be made by the patient. *See* Derman, RII:113. It is standard medical practice to continue rational doses of medication until the patient consents to detoxification, unless the patient is abusing the medication.

128. Here, the VA had every reason to believe plaintiff's pain was real. *See id.* at 135.

129. Moreover, the doctors counselled him repeatedly about the possibility of dependency on tylox, and they recommended detoxification.

130. Plaintiff chose not to stop the medication. On the other hand, he never overdosed, did not use medications to achieve a "high," and appeared to take them as directed. *See* Derman, RIV:22, 24. Under the circumstances, the VA doctors used acceptable judgment in continuing and then tapering analgesic prescriptions.

## CONCLUSIONS OF LAW

*A. Lack of Subject Matter Jurisdiction*

1. The Federal Tort Claims Act (FTCA) requires a plaintiff to present his claim first to the appropriate federal agency. *See* 28 U.S.C. § 2675(a).

2. And, because the FTCA constitutes a waiver of the United States of America's sovereign immunity, the statutory requirements for pursuing a claim must be adhered to strictly. *See Keene Corp. v. United States,* 700 F.2d 836, 841 (2d Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). The no-

tice of claim must present facts sufficient to permit an investigation and settlement of the claim. *See Johnson by Johnson v. United States,* 788 F.2d 845, 848–49 (2d Cir.1986).

3. Plaintiff's administrative claim gave no notice of negligence based upon the Long Beach VA's treatment or arising from prescriptions other than tylox.

4. A listing attached to the original claim cited medications prescribed only at the Northport VA, thereby restricting the scope of the administrative investigation.

5. In addition, plaintiff's counsel, in correspondence and discussions with the VA District Counsel, expressly limited the scope of the investigation to tylox issued at the Northport VA after November 1982. *See* Declaration of Barry Modrov ¶¶ 5, 7, Ex. 3.

6. The claim was silent regarding the fact that plaintiff had been treated, or allegedly mistreated, at the Long Beach VA hospital.

7. The Court finds no excuse for that omission because, as early as September 13, 1985, plaintiff had the Northport VA medical record that contains the six remaining pages of progress notes and prescriptions upon which his claim against the Long Beach VA is founded. *See* Modrov Decl. ¶ 2, Ex. 1; Pltf's Ex. 3, at 143–48.

8. Similarly, plaintiff's claim did not alert the government to the allegation that medications other than tylox were overprescribed at either VA hospital.

9. Many medications were given to plaintiff, including motrin, benadryl, vistaril, and noludar to name just a few. It would be unfair to require the United States to investigate every prescription, without any guidance from plaintiff as to which ones he considered tortious. The Court concludes that the government was given no notice of any allegations concerning valium, benzodiazepines generally, or tylenol # 3.

10. Plaintiff's notice of claim was insufficient to allow the government to evaluate these two issues, thus he failed to exhaust administrative remedies.

11. As a result, this Court lacks subject matter jurisdiction to decide the new claims regarding treatment at the Long Beach VA, or prescriptions of tylenol # 3, valium, librium, xanax, serax, or dalmane.

B. *Statute of Limitations Bar*

12. Under the FTCA, a tort claim is "forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues." 28 U.S.C. § 2401(b).

13. An action accrues when plaintiff knows both the existence and probable cause of his alleged injury, not when he realizes he has a legal action. *See United States v. Kubrick*, 444 U.S. 111, 122–25, 100 S.Ct. 352, 359–61, 62 L.Ed.2d 259 (1979).

14. Assuming, *arguendo*, that plaintiff adduced evidence showing physical addiction while at the Long Beach VA, plaintiff's claim against the Long Beach VA would have accrued the day he left in November 1982.

15. Thus his claim should have been filed no later than November, 1984 and, since it was not, it is time barred.

16. It would be inimical to Congress' design to subject the United States to such a stale claim. *See Kossick v. United States*, 330 F.2d 933, 934–35 (2d Cir.), *cert. denied*, 379 U.S. 837, 85 S.Ct. 73, 13 L.Ed.2d 44 (1964).

17. The Long Beach VA medical records are no longer available, some seven years after plaintiff's last treatment there. The government's defense is severely prejudiced by this absence of evidence; consequently, this Court will not permit plaintiff's belated attempt to add claims barred by section 2401(b).

18. The "continuous treatment" doctrine will not vitiate the fatal effect of the limitations bar. Under that doctrine, as applied to medical malpractice cases, the statute of limitations may be tolled where plaintiff is under the continuous care of the same doctor or hospital during the course of treatment. *See Camire v. United States*, 535 F.2d 749, 750 (2d Cir.1976). In the instant case, however, plaintiff received care from two different VA hospitals and several different physicians within those hospitals.

19. Nor can this jurisdictional defect be cured by "relating back" under Fed. R.Civ.P. 15(c). "Relation back" under Rule 15(c) speaks only to the scope of complaints, it has no bearing upon filing an administrative claim under the FTCA. Even if the original complaint had put the United States on notice of these claims, that would not save them. They were absent from the administrative claim, so the VA was unable to evaluate or settle them.

C. *Plaintiff's Failure to Prove Liability*

20. Assuming again, *arguendo*, a valid and timely administrative claim, the Court has jurisdiction over the remaining allegations of medical malpractice pursuant to 28 U.S.C. § 1346(b).

21. The FTCA provides that, "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

22. Accordingly, the Court looks to the law of the state where the cause of action arose, namely New York. *See* 28 U.S.C. § 1346(b).

23. A summary of New York law of medical malpractice written by Judge Kearse is apropos:

A physician's obligations to his patient are to possess at least the degree of knowledge and skill possessed by the average member of the medical profession in the community in which he practices, to exercise ordinary and reasonable care in the application of that professional knowledge and skill, and to use his best judgment in the application of his knowledge and skill. In order to show that the defendant has not exercised ordinary and reasonable care, the *plaintiff ordinarily must show what the accepted standards of practice were* and that the defendant deviated from those stan-

dards or failed to apply whatever superior knowledge he had for the plaintiff's benefit.

*Sitts v. United States,* 811 F.2d 736, 739–40 (2d Cir.1987) (emphasis added) (citing, *Toth v. Community Hospital at Glen Cove,* 22 N.Y.2d 255, 262–63, 292 N.Y.S.2d 440, 447, 239 N.E.2d 368, 375 (1968); *Monahan v. Weichert,* 82 A.D.2d 102, 105–06, 442 N.Y.S.2d 295, 297–98 (4th Dept.1981)).

24. In addition, plaintiff must establish that the defendant's negligence was a substantial factor in producing the alleged injury. *See Koster v. Greenberg,* 120 A.D.2d 644, 502 N.Y.S.2d 395 (2d Dept.1986).

25. Plaintiff argued only that the VA doctors failed to exercise ordinary and reasonable care. However, as noted earlier, plaintiff's expert failed to identify what the accepted standards of practice were at the time.

26. The applicable standard was, nevertheless, amply demonstrated by plaintiff's private physicians. For seven years, Dr. Diefenbach issued month-long prescriptions for 240 mg. codeine and 40 mg. valium per day. At least two other private physicians provided analgesics and benzodiazepines for prolonged periods of time. These examples show that the VA's thirty-day prescriptions were not improperly "open-ended," "irresponsible" or "unsupervised."

27. Dr. Diefenbach believed plaintiff needed medication to function and therefore continued to prescribe.

28. He warned the patient against depending on drugs and attempted to wean him from valium by substituting other drugs.

29. Defendant's expert confirmed that this was the standard practice; thus, the VA's continued prescriptions, together with recommendations to detoxify, were appropriate, until such time as the plaintiff decided he was ready to discontinue.

30. When the VA stopped dispensing valium on an outpatient basis, it was well within accepted standards of care to substitute librium, xanax and dalmane.

31. Plaintiff failed to prove that the VA's treatment caused or perpetuated his dependency upon medication.

32. There was no proof of any physical dependency, although plaintiff was already psychologically dependent, at least on narcotic analgesics, before he began treatment at the Long Beach VA.

33. When he left the VA's care six years ago, he continued to take the same or similar medications from private doctors, and he has never sought detoxification.

34. Based on this history, the Court concludes that treatment at the VA was not a substantial factor in causing or perpetuating plaintiff's habituation to analgesics and benzodiazepines.

35. No matter what the VA did or did not do, this plaintiff would have sabotaged the doctors' efforts.

36. Plaintiff substantially caused his own problems by refusing work up, psychiatric treatment and detoxification.

37. Each time the VA ceased to supply valium or tylox, plaintiff simply obtained the drugs from private physicians. There is no reason to think that if the VA had stopped prescribing any earlier, plaintiff would, in fact, have stayed off medication.

## CONCLUSION

38. Plaintiff failed to file an adequate or timely administrative claim with regard to the Long Beach VA, and failed to file any administrative claim as to the Northport VA. Plaintiff also failed to identify the applicable standard of care, establish causation or demonstrate liability on the part of either the Long Beach VA or the Northport Va.

39. Accordingly, the Clerk is directed to enter judgment in favor of the defendant United States with costs.

SO ORDERED.