Gustave **CATTANEO**, Plaintiff,

v.

**UNITED STATES** of America, Defendant.

No. CV 94–5341 (ADS).

United States District Court,
E.D. New York.

Feb. 19, 1997.

Agoglia, Fassberg, McGee & Crowe, P.C., by E. Kevin Agoglia, Mineola, NY, for Plaintiff.

Zachary Carter, United States Attorney, by Pamela R. Perron, Assistant United States Attorney, Brooklyn, NY, for Defendant.

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

This is an action brought under the provisions of the Federal Tort Claims Act (28 U.S.C. § 1346[b] and 28 U.S.C. §§ 2671–2680) to recover damages for personal injuries allegedly sustained by the plaintiff Gustave Cattaneo (the "plaintiff" or "Cattaneo") as a result of medical malpractice allegedly committed by certain physicians at the Veterans Administration Hospital ("the Hospital") in Northport, Suffolk County, New York.

The thrust of the plaintiff's claim is that the physicians at the Hospital who participated in his total left hip arthroplasty on January 4, 1994, failed to properly place the implant device, so that it became loosened, is a cause of pain and requires corrective surgery. In sum, the plaintiff contends that the operating physicians departed from accepted practice in performing the hip implant operation, which was a cause of the loosening of the implant, the resultant injuries and the necessity for corrective surgery.

There are two issues in this case. First, whether the plaintiff proved, by a preponderance of the credible evidence, that the hip implant device inserted in the plaintiff's left leg is "loosened." Second, if the plaintiff proved that the device is "loosened," whether the plaintiff further proved that this condition occurred as a result of a departure from accepted medical practice in the course of the surgery performed at the Hospital.

## I. THE APPLICABLE LAW

This action is brought pursuant to 28 U.S.C. § 1346[b], which establishes the jurisdiction of the United States District Court for civil actions against the United States, "for money damages ... for personal injury ... caused by the negligence or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

Under the Federal Tort Claims Act, the liability of the United States is the same as that of a private person in the State of New York. (*Guttridge v. United States,* 927 F.2d 730 [2d Cir.1991]; *Chen v. United States,* 854 F.2d 622, 625, 626 [2d Cir.1989] ).

The New York law of medical malpractice was clearly stated by Judge Kearse in *Sitts v. United States,* 811 F.2d 736 (2d Cir.1987) as follows:

> [a] physician's obligations to his patient are to possess at least the degree of knowledge and skill possessed by the average member of the medical profession in the community in which he practices, to exercise ordinary and reasonable care in the application of that professional knowledge and skill, and to use his best judgment in the application of his knowledge and skill. In order to show that the defendant has not exercised ordinary and reasonable care, the plaintiff ordinarily must show what the accepted standards of practice were and that the defendant deviated from those standards or failed to apply whatever superior knowledge he had for the plaintiff's benefit. *Toth v. Community Hospital at Glen Cove,* 22 N.Y.2d 255, 262–63, 292 N.Y.S.2d 440, 447, 239 N.E.2d 368, 372 (1968); *Monahan v. Weichert,* 82 A.D.2d 102, 105–06, 442 N.Y.S.2d 295, 297 (4th Dep't 1981). The requirement that the plaintiff introduce expert medical testimony is imposed in part because "without expert assistance, a jury will often have no understanding of what constitutes reason-

able behavior in a complex and technical profession such as medicine." *Paul v. Boschenstein*, 105 A.D.2d 248, 249, 482 N.Y.S.2d 870, 872 (2d Dep't 1984). The requirement is no less applicable in a case that is tried to the court without a jury. *See Charlton v. Montefiore Hospital*, 45 Misc.2d 153, 155, 256 N.Y.S.2d 219, 222 (Sup.Ct.Queens Co.1965).

## II. THE TRIAL—FINDINGS OF FACT

 This memorandum decision and order disposing of this action includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

### A. The Plaintiff's Case

The plaintiff Gustave Cattaneo is a 65 year old veteran. He was in an Army Airborne Division from 1951 to 1954. He is a divorced man with six children. Cattaneo is a retired carpenter contractor. He has been treated at the Northport Veterans Hospital for many years, and is still being treated at the Hospital. His first complaint with regard to his left hip was in 1990 when he was treated by Dr. Peter Altner at the Hospital. Dr. Altner is the Chief of Orthopedic Surgery at the Hospital. Cattaneo was suffering from pain in his left groin, left thigh and left knee. Between 1990 and December 1992, the plaintiff was treated by Dr. Altner and other physicians at the Hospital Orthopedic Outpatient Clinic. X-rays were taken and Naprosyn was prescribed. By December 1992, the plaintiff had lost 90 percent of the motion of his left hip and he agreed to the recommendation for a total hip arthroplasty, which was originally scheduled for December 2, 1992. However, the plaintiff developed chest pains causing the hip operation to be postponed. Instead he underwent triple bypass surgery on December 21, 1992.

The left hip surgery was rescheduled for January 4, 1994 at the Hospital, and was performed on that date. Prior to the surgery the plaintiff signed a consent form and met with Dr. Altner, Dr. Louis Lombardi, an attending orthopedic surgeon, Dr. Gilligan and Dr. Christian Dee. After the surgery Dr. Lombardi told the plaintiff that he performed the surgery and that his left leg was

1/2″ longer. After being discharged from the Hospital the plaintiff had physical therapy treatments and improved steadily. The left hip pain was gone and there was improvement in the function of his left hip. He wore a lift in his right shoe. The plaintiff testified that at various times he was told his left leg was 3/4″ and 1″ longer than his right leg. At this point, the Court notes that the parties stipulated that there was no departure from accepted medical practice as a result of the lengthening of the plaintiff's left leg during the course of the left hip implant surgery on January 4, 1994.

On April 21, 1994, Cattaneo complained of a slight pain in the right hip. Naprosyn was again prescribed. On October 17, 1994, the plaintiff complained of pain in the scar on the left hip. In February 1995, he saw Dr. Altner for pain on the right side and also, pain in the scar on the left hip. He was told that this latter pain was "normal." X-rays were taken of both hips. Cattaneo was told by Dr. Altner that the left hip was "fine, perfect" and that his left hip pain was because of "nerves in your back." In May 1995, he developed a slight pain in the left groin.

In March 1994, the plaintiff saw a private physician, Dr. Richard Goodman, an orthopedic surgeon, for the long left leg length and pain in the right lower back, right side and right groin. He saw Dr. Goodman six or seven times. He underwent physical therapy for ten weeks, which was helpful for movements of his left side, but the pain increased on the right side. Cattaneo also developed pain in the left buttock and groin. Dr. Goodman told him "you have a loose hip." He was devastated.

On November 13, 1995, the plaintiff saw a second private orthopedic surgeon, Dr. Thaddeus Spak. A bone scan was performed on November 20, 1995. Cattaneo was told by Dr. Spak that the scan showed pockets of fluid in the left hip which was either an infection or a loosened prosthesis. An aspiration was performed by Dr. Spak at Huntington Hospital on December 28, 1995. Dr. Spak told him that there was no infection but the "hip is definitely loose and has to be redone." The plaintiff was told to walk with

a cane and "take it easy." He last saw Dr. Spak on January 12, 1996.

However, Dr. Spak referred the plaintiff to a neurosurgeon, Dr. David Leivy. He saw Dr. Leivy on March 7, 1996. A myelogram was recommended which was performed on March 28, 1996 at Huntington Hospital. Cattaneo was told by Dr. Leivy that he had L4–L5 degeneration in the lower back, but there was no need for an operation.

At the present time Cattaneo complains of pain in the left hip, knee and groin, occurring twenty-four hours a day, and getting increasingly worse, which is making his life miserable. However, he can move his left hip better than before the operation. He does exercises at home including stretching and bicycle riding. The plaintiff takes daily medications including naprosyn and tylenol with codeine. He is still being treated at the Northport Veterans Administration Hospital. Cattaneo also complains of pain in his right hip, which is increasing. Despite the pain in both hips and other areas of his body, the plaintiff continues to perform certain household chores such as mowing the lawn, doing minor repairs around the house and playing nine holes of golf.

With regard to his back pain, the plaintiff testified that while he did have such pain prior to the hip surgery, he stated that he never had any medical treatment for that condition.

On cross-examination, the plaintiff testified that he made 15 or 16 parachute jumps while in the Army in 1951 or 1952. During one of these jumps, he sustained a sprain of his lower back. A medical record dated March 5, 1952 (Defendant's Exh. R) reveals a diagnosis of a "low back pain" with full range of motion and no neurological findings. In a document entitled "Veteran's Application for Compensation or Pension" (Defendant's Exh. S), signed by the plaintiff, he stated that the injury for which claim is made is "Back trouble Jan. 52" It is also stated in this application that the plaintiff complained of "back trouble" four times from January 1952 to June 1953 and was treated in a hospital and three dispensaries. There is also in evidence an x-ray report dated May 6, 1954 (Defendant's Exh. T) in which it is stated "Low back ache (upon long sitting, in damp weather or in heavy lifting)". The x-ray report states that the lumbo-sacral spine "Reveals slight levo scoliosis of the lumbar spine and no other significant findings." At the time Cattaneo enlisted in 1951 he was told he had an "abnormal curvature of the lumbar spine."

Starting in 1957 Cattaneo was employed as a general contractor doing masonry, which was "hard work" and involved lifting bags of cement weighing about 96 pounds. In 1975 he changed his occupation to that of a carpenter which involved less lifting. In the 1980s Cattaneo had left hip pain and started limping. He also had numbness and a burning feeling in his toes. In addition, he was diagnosed as having diabetes. By 1991 the plaintiff was having excruciating pain in the left hip, walked with a cane and could not drive. In October 1991, he had to stop working and he received social security disability benefits.

Further, Cattaneo testified that following his left hip surgery, after a period of time on crutches, his left hip did very well:

Q Going to the post-operative period, after the surgery you were on crutches for about two—three or four months?

A Yes.

Q And then after that your left hip progressed fine?

A Yes.

Q The pain in your left lower back went away?

A Yes.

Q And the pain in your left knee went away?

A Yes.

Q The pain in your left groin went away?

A Yes.

Q And you could sit without excruciating pain?

A Yes.

Q Today you don't walk with a crutch?

A With a cane, no.

. . . .

Q With that lift on your right shoe you don't have a limp when you walk wearing your shoes?

A Correct.

Q You can dress yourself, correct?

A Yes.

Q And you can drive a car?

A Automatic transmission.

Q You mentioned that you were doing exercise five days a week on a stationary bicycle?

A Yes.

Q And you were doing leg exercises several times a week?

A Yes.

(Tr. at 612–613).*

Also, at the present time, despite his complaints of pain in the left hip, his right hip and other parts of his body, Cattaneo leads a moderately active life:

Q Okay.

I think you testified you can play golf?

A Nine holes, yes.

Q And you also go boating?

A My son takes me boating.

Q You have gone out fishing?

A On a big boat out of Crab Tree.

Q Since your hip replacement surgery?

A Yes, but I have gone before, yes.

Q And you wear—you also do some painting around the house?

A Yes, I do.

Q And you take your grandchildren to lunch?

A Yes, I do.

. . . .

Q So, you have not used a special device for the toilet seat since June of 1994?

A I was told by the VA doctors it wasn't necessary.

Q Okay.

So, you haven't used one since that date?

A No.

(Tr. at 617–618).

Until May 1995, Cattaneo's major complaints were pain in his right hip and lower

*Tr. stands for Trial Transcript.

back. There is also evidence in the record that only in May or June 1995 did he start to get pain in his left hip. (Tr. at 619).

The plaintiff produced four physicians in person and one by deposition. The deposition of Dr. Christian Dee is not significant and adds little to the relevant facts. The first physician to testify on behalf of the plaintiff was Dr. Dennis Rossi, a radiologist. He reviewed the x-rays taken at the time of the left hip surgery and stated that the implant was in "an anatomically correct position." Dr. Rossi reviewed a second set of x-rays taken on October 27, 1994 and stated that he found a "slight lucency along the upper margin of the stem portion of the prosthesis . . . that is suggestive of loosening of the stem portion of the prosthesis" (Tr. at 23).

Dr. Rossi saw the same "lucent line" on the June 6, 1995 x-rays. Also in a bone scan done on November 21, 1995, he saw some activity which is "highly suspicious of loosening of the prosthesis" (Tr. at 30). In addition, he reviewed an arthrogram taken on December 22, 1995 and saw evidence of loosening of the stem. There was no evidence of loosening of the head and neck of the implant. Asked his opinion as to whether the left prosthesis stem is loose, Dr. Rossi answered, "I think it is." He also agreed with a report from Dr. Spak, the orthopedic surgeon, which report stated that it was a loose prosthesis. Taking all the components together, including the patient's symptoms and all the films, his opinion is that this is a loose prosthesis.

On cross-examination Dr. Rossi conceded that in the June 4, 1994, October 27, 1994 and June 6, 1995 x-rays, the prosthesis was still in alignment. Dr. Rossi hedged somewhat, with regard to his opinion as to a loosening, when he stated:

A What I would do in the ordinary course of practice is to report the finding of the lucency as I have seen it, and suggest it could be a sign of early loosening, and recommend a bone scan for further evaluation. And I would certainly defer to the orthopedist's judgment in evaluating

these findings in correlation with the patient's symptoms.

Q And that correlation would be done by the orthopedic surgeon; is that correct?

A Yes.

(Tr. at 50).

Dr. Rossi also conceded that the arthrogram of December 22, 1995 was of poor quality and was of limited value. He also stated that increased activity in bone scans may be of no significance and may constitute a false diagnosis of loosening. In fact, the radiologist who read the bone scan at the Huntington Medical Group reported that "loosening is possible."

Dr. Rossi also testified that he had no opinion as to what caused this loosening and he could not state the degree of loosening. Dr. Rossi also agreed that a certain percentage of patients who have had total hip replacements develop looseness, which is a known risk after such surgery. Of importance, he also stated that he did not see any change in the alignment of the implant from October 1994 to June 1995 and he saw no movement of the cemented component. Further, Dr. Rossi conceded that cemented hip implant components normally show "one to two millimeter wide radiolucent zones at cement interfaces" (Tr. at 77) and that a "progressive widening" of the lucency coupled with cement fractures are particularly suggestive of loosening. The Court finds that in this patient there was no progressive widening of the lucency nor were there any cement fractures in the hip implant.

The second physician produced by the plaintiff is Dr. Richard Goodman, an orthopedic surgeon, who ceased doing surgery in 1984, but is still in practice. He is also an attorney. Dr. Goodman described the method of doing a total hip arthroplasty. He stated that the normal life expectancy of a hip implant was ten to twenty years, depending on the size, weight and activities of the person involved. However, the Court notes that Dr. Goodman has not performed a total hip arthroplasty since the early 1980s, and only did two or three such operations as the attending surgeon.

Dr. Goodman first examined the plaintiff on March 23, 1994. His complaints were pain in the left hip, groin and knee. Dr. Goodman ordered and reviewed x-rays of Cattaneo's left hip. Dr. Goodman's diagnosis in June 1995 was that the plaintiff "had a loose hip prosthesis." He made the diagnosis based on the June 1995 x-rays which demonstrated movement of the stem causing a "slight decrease of the shadow on the x-rays." Dr. Goodman further opined that a loose prosthesis can be a competent producing cause of pain. More importantly, Dr. Goodman testified that the doctors who performed the operation deviated from good and accepted procedures during the course of the left hip arthroplasty:

Q What is the basis of your opinion that these doctors deviated from good and accepted procedure?

A Well, if you look at the original of this X-ray here, there is a space between the collar of the prosthesis, and the top bony edge of the femur. Which means if there is a space there, even if it is packed with bone grafting, which they did, that it would allow this part to ride back and forth when patient puts weight on his femoral head. And the weight line is through the acetabulum.

If this is not on the bone solidly, this is going to cause a downward pressure here. When he lifts his leg up this is going to come back. And there will be a constant wiggle, twisting or torquing here. This collar rests on the bone to absorb that and prevent that. That's the idea of the collar.

THE COURT: You said there is a space between the collar and what?

THE WITNESS: And the cortex of the femur.

THE COURT: Show it to me again, please.

THE WITNESS: There is a quarter inch space in here approximately, on this film. But since this film is not exactly horizontal, and this collar is thinner than this and this is tilted. So this is based and spaced a lot higher than that.

Q You say there is a space between the uppermost top of the femur and where the collar is supposed to sit on the femur?

THE WITNESS: Yes.

. . . .

Q All right.

Sir, do you recall noting in the operative report that it was reported that after they inserted the femoral component, it was found to sit approximately seven millimeters above the femoral calcar and for this reason the femoral head was used to create an A U T O G E N O U S, autogenous, bone graft.

Is that saying, Doctor, that they had removed the head of the femur in the early portion of the procedure?

A Yes.

Q And they then had this piece of bone in the operating room; is that correct?

A Yes.

Q And they took a piece of that and tried to fill in the space where it sat seven millimeters proud?

A Yes.

THE COURT: I didn't get that word.

MR. AGOGLIA: Proud.

Q Is it fair to say that it is seven millimeters above the level of the calcar?

A Yes.

. . . .

Q Is that meant to rest firmly on the femoral calcar?

A Yes.

(Tr. at 131–134).

Further, Dr. Goodman expressed the opinion that this space occurred because the femoral shaft was not made large enough so that the stem "did not go all the way in," that this was a deviation from accepted practice and was the proximate cause of the prosthesis becoming loose. In addition, Dr. Goodman testified that this loosened condition was a cause of the pain in the plaintiff's left hip, which condition would continue to deteriorate. In so testifying, Dr. Goodman readily conceded that a prosthesis can become loose for "reasons unrelated to any malpractice." Dr. Goodman further testified that there were greater risks associated with reoperating on the left hip.

Dr. Goodman found that the plaintiff's left leg was 3/4 of an inch longer than the right leg, whereas prior to surgery, the left leg was 1/4 of an inch shorter. In his opinion, this condition "could put a strain on an otherwise arthritic or degenerative back" (Tr. at 141) and it "was the cause of the pain in the back." He also stated that a 1/2 inch difference in leg length is not unusual.

Dr. Goodman testified that the plaintiff has osteoarthritis in his right hip and spine. Also, he stated that "pain of spinal origin may be interpreted as hip pain," and that can be as a result of a herniated disc. In addition, he stated that x-rays are among the most accurate method of predicting the status of the implant fixation. Also, with regard to an x-ray reading, "development of a continuous radiolucent zone of greater than two millimeters has been found to be a reliable indication of loosening."

The plaintiff also called Dr. Louis Lombardi, the orthopedic surgeon in chief at the plaintiff's left hip implant surgery. Dr. Lombardi performed about 150 hip operations as the attending surgeon in charge, and presently does 50 such operations a year. He was assisted by Dr. Gilligan, the Chief Resident and Dr. Christian Dee, a Junior Resident. Prior to the plaintiff's operation, he examined him in the hospital and reported that the plaintiff had "unrelenting pain in the left hip which is actively related."

The operation was a team effort with Dr. Lombardi in charge. Describing the operation, Dr. Lombardi stated it was good practice to make sure that the stem of the implant device is properly fitted in the femoral canal. In this operation the implant device did not fit and "sat about seven millimeters above the level of the top of the femur," which is about 1/4 of an inch, even though the femoral canal was properly prepared.

Dr. Lombardi called in Dr. Altner, the Chief of Orthopedic Surgery at the Hospital, as he usually does. He showed Dr. Altner the 7 millimeter space:

Q Did you ever ask Dr. Altner what you should do with respect to the collar sitting seven millimeters proud?

A I asked him what he sought (sic) of it.

Q What did he say?

A He thought everything was okay. He specifically asked me if I thought it was stable. And I showed him again that it was, and that the leg lengths were reasonable.

(Tr. at 178–179).

The Court questioned Dr. Lombardi concerning the 7 millimeter gap and the bone graft filling the space:

THE COURT: If the collar is designed to fully engage the femoral calcar, in this case it didn't engage the femoral calcar, did it?

THE WITNESS: It did after the bone graft was placed.

THE COURT: You testified that there was a seven millimeter gap, and I am using lay language, between the calcar, which is the top portion of the femur and the collar.

THE WITNESS: Yes.

THE COURT: You can't let that gap remain, correct?

THE WITNESS: Yes.

THE COURT: Or the device would be inoperative?

THE WITNESS: No.

THE COURT: It would be operative still?

THE WITNESS: Yes, it would.

THE COURT: In other words, the fixation with the stem would be enough even without the graft?

THE WITNESS: Yes.

THE COURT: You said to make sure you put the graft in?

THE WITNESS: The graft was put in to prevent the possibility of the prosthesis subsiding, the outside possibility that the prosthesis would subside at a later time.

THE COURT: With the graft in place— by the way, did you do the graft?

THE WITNESS: Yes, I did.

THE COURT: When you had the graft in place, was it now a connection between the collar, the bottom of the collar, I forget the medical term, but the distal portion of the collar—

THE WITNESS: Yes.

THE COURT: And the bone graft?

THE WITNESS: Yes.

THE COURT: That being an extension of the femur?

THE WITNESS: Exactly.

THE COURT: With reasonable medical certainty has—does that happen from time to time?

THE WITNESS: Yes.

THE COURT: Have you done bone grafts before?

THE WITNESS: Yes, I have.

THE COURT: To fill in the space?

THE WITNESS: Yes.

THE COURT: With reasonable medical certainty what is the result of—withdrawn.

With reasonable medical certainty, in your opinion is the stability of the device any different with the bone graft than it is if the collar would have rested directly on the calcar?

THE WITNESS: No, there is no difference as evidenced by the use of non-collared prostheses.

THE COURT: Please proceed.

(Tr. at 482–484).

As stated above, in order to close the 1/4 inch gap, Dr. Lombardi placed a bone graft in that space to prevent subsidence, meaning the condition where the prosthesis sinks into the canal. Dr. Lombardi also stated that complaint of pain at the site of the surgery is one sign of a loose prosthesis. After the surgery was concluded Dr. Lombardi reviewed the post-operative x-rays and found that the prosthesis "was in good position." He continued to examine the plaintiff during his hospital stay and after his discharge. By April 21, 1994, the wound was healed and Cattaneo had no pain on motion of the left hip.

Dr. Peter Altner is Chief of the Orthopedic Service at the Hospital. He testified that the plaintiff has an obvious scoliosis and degenerative joint disease in the lower back. He attributes much of the plaintiff's pain on both sides of his body to the lower back conditions. Dr. Altner was called into the operating room to give advice with regard to the gap and the bone graft designed to close the space. Dr. Altner reviewed a June 29, 1995

x-ray (Defendant's Exh. B32) and stated that the left hip implant was in excellent position with no loosening. The Hospital radiologist's report also states "There is no loosening of the prosthesis." Dr. Altner was of the opinion that the bone graft united with the calcar to form one piece and did not in any manner cause looseness.

## B. *The Defendant's Case*

In its case, the defendant produced four physicians. Initially, the defendant called Dr. David M. Leivy, a neurosurgeon, and one of the plaintiff's treating physicians. Cattaneo was referred to Dr. Leivy by Dr. Spak. He examined the plaintiff on March 7, 1996. The plaintiff's chief complaint was pain in the right thigh and right lower extremity, aggravated by activity. He also had right lower back pain. At that time the plaintiff used a cane in his right hand. Dr. Leivy was of the opinion that the plaintiff had "lumbar stenosis or disc herniation compressing the L4 nerve root on the right." He recommended a myelogram and a cat scan which were performed on March 28, 1996. The findings on the myelogram were (1) a disc bulge at L4–L5 with narrowing at L4–L5, and (2) substantial degenerative changes. This degenerative process had progressed for years. The cat scan revealed a herniated disc at the level of L4–L5, narrowing at L3–L4 with irritation of the nerve roots. The radiological report set forth the diagnosis as a herniated disc at L4–L5. Dr. Leivy was asked about the etiology of the plaintiff's pain at the time of his examination in March 1996:

Q Did you come to a conclusion as to what caused the pain that was described in your report, dated March 7th, 1996 and that is in the first paragraph of your report to Dr. Spak?

A Yes, I felt he had a lot of degenerative disease in his low back and a disk (sic) herniation at L4–5, and that all of this was enough to produce the discomfort he was experiencing.

(Tr. at 364).

Significantly, Dr. Leivy testified that the plaintiff was not complaining of pain on the left side when he examined him on March 7, 1996, and he saw no problem with the left hip implant, nor did he believe the length of the plaintiff's left leg contributed to his problems:

Q Now, in March of 1996, was he complaining of any pain on the left side?

A No.

Q And based on the examination that you did of the patient, and your review of the films, would you be surprised if he had symptoms of pain on the left side?

A No. He could very well from the films.

Q Did you consider at all whether his hip prosthesis was the source of the pain rather than his spine?

A Well, whenever I examined patients with low back and leg pain, it is always a consideration. I didn't see any evidence of that here.

Q Do you think the surgery to implant his hip prostheses cause (sic) the herniation you saw on the film?

A No.

Q Why not?

A I don't know of anything that says if you have a hip replaced you end up with a herniated disc. I think they are unrelated.

Q Well, what about the narrowing of the foramina that you had spoken about?

A This is a long-term chronic degenerative process.

Q You don't think that the surgery caused that?

A No.

Q And how about the diffuse bulging of the annulus fibrosis at L3–4? Did the hip replacement surgery cause that?

A No.

Q How about if after hip replacement surgery a person had one leg an inch shorter—an inch longer than the other. Let's assume that.

Would that cause the pain and objective findings that Mr. Cattaneo showed when he came to you?

A I don't think so, no.

Q Why not?

A Again, we are seeing the results of a long-term chronic degenerative process

that started maybe 10, 15 years earlier, and was finally causing some symptoms.

Q If Mr. Cattaneo's left hip prosthesis had become loose, would you expect to see the types of complaints of pain that he presented to you with?

A I would have thought he had left hip pain I guess.

(Tr. at 364–366).

Steven Olster is a physician's assistant who examined the plaintiff at the Hospital. On September 22, 1992, he wrote a note in the Hospital record stating that Cattaneo's "history revealed low back pain with difficulty bending over for years." Prior to the hip surgery he discussed the risks of the surgery including leg length discrepancies and loosening.

The second physician produced by the defendant was a most impressive and persuasive witness. Dr. Edward T. Habermann is presently a Professor and Chairman of the Department of Orthopedic Surgery at the Montefiore Medical Center, Albert Einstein College of Medicine. He performs 100 total hip arthroplasties per year and, over the last 30 years has done between 2000 and 3000 such operations. In addition, he performs approximately 25 hip implant revision operations per year. Dr. Habermann reviewed all of the hospital records, physicians' reports, x-rays, cat scan, myelogram, bone scan and arthrogram films and he also reviewed the testimony of Dr. Goodman. In addition, Dr. Habermann examined the plaintiff on two occasions, on September 18, 1995 and October 18, 1996. In the October 1996 physical examination, the plaintiff complained of relatively constant pain in the left posterior lateral buttock radiating to his thigh and knee. He also had pain in the lower back, more on the right side and "burning numbness and tingling in the toes on both feet." After conducting what was apparently a thorough and lengthy physical examination, Dr. Habermann found that all the motions of the legs and back were pain free.

Dr. Habermann also measured the plaintiff's leg lengths by several methods and found that the plaintiff's left leg was 3/8 of an inch longer than the right leg. He discussed the effect of the 3/8 inch lengthening of the plaintiff's left leg:

Q Did you consider that leg length discrepancy to be an acceptable measurement?

A An acceptable measurement. It was my measurement, so it was what I got.

Do you mean, is it acceptable to have a 1.2 centimeter difference in leg lengths?

The reason for doing a total hip arthroplasty is to give the patient stability, relief of pain. And if you end up, which is often the case, of slight lengthening of the extremity, we find it is an acceptable trade off. We like to make it as close (sic) possible as we can, if they have arthroarthritic changes in the opposite hip, we may make it a little longer, because sometimes the opposite hip may be doing it at a future time where we can make it even, the leg length.

(Tr. at 508–509). Dr. Habermann's examination also revealed that the plaintiff walked without a limp and without the use of a cane.

In his initial examination on September 18, 1995, the plaintiff stated that he had no pain referable to his left hip. His examination revealed a negative straight leg raising test and left thigh pain. In May 1995, the plaintiff developed "left sciatic like pain" down the left thigh and calf into the ankle. The plaintiff had a past history of "some back pain." Dr. Habermann stated that sciatic pain differs from hip pain, which is in a different area. He stated that the most characteristic hip prosthesis-related pain is "get up and start to walk" pain or "start up pain":

Q What is the classic pattern of hip pain?

A Hip pain is pain, frequently—

Q Let me clarify my question. I mean from a hip prosthesis.

A Well, hip pain from a prosthesis can be pain in the groin, which is this region.

It can be start up pain.

The most characteristic pain from patients who have hip prosthetic related pain, is when you get up from a chair and get up and start to walk. The getting up and starting to walk produces pain. And that is very characteristic of pain produced with a loose femoral component.

Q What happens when the patient continues to walk?

A They frequently get better, or not better, depending on the character of the degree of looseness, the degree of tolerance to their pain. Many get better.

But the reason they have start up pain with a loose prosthesis in the femur, and we call that start up pain, is that there is an enormous amount of pressure and torque put on that prosthesis when you get up out of a chair, and you do this. It is called off-axis, A X I S, loading.

What it does with a loose prosthesis, it tends to torque the prosthesis which is loose, producing those symptoms.

Q Would pain attributable to a hip prosthesis be constant or once in a while?

A As a rule hip prostheses that are loose are not very painful when you are resting. They become more painful with changing position or excessive loading, such as getting out of a chair. Most people who have a loose prosthesis are not really painful most of the time. They are painful only with certain activities.

(Tr. at 506–507).

In Dr. Habermann's opinion the plaintiff's present complaints of pain are "a reflection of his low back derangement and discogenic symptoms," with nerve root irritation. In his view, the pain on both sides is a result of the same low back problem. In addition, Dr. Habermann stated that the pain in the plaintiff's left groin "could be a reflexion of pain from his (left) hip as well … (because) Not every patient who has a total hip replacement is totally relieved of pain in their hip … and it is often hard to distinguish the anatomic site of pain difference." (Tr. at 510). As to the variation in the plaintiff's leg length, Dr. Habermann testified that this change did not aggravate his spinal problems.

At the crux of this case, Dr. Habermann rendered certain opinions with regard to the left hip implant operation:

Q Do you think that Mr. Cattaneo has to have his hip revised, that is taken out and replaced, his left hip?

A No.

Q Do you think his hip replacement at the VA Hospital was a successful operation?

A Yes.

(Tr. at 511).

Dr. Habermann testified that there are a number of risks in hip implant surgery including infection, leg length discrepancies and instability. Questioned about loosening, he testified that "loosening is when one or more components are not fixed rigidly within the bone." To determine loosening Dr. Habermann stated the following investigatory rules: (1) a good clinical history, including "start up pain when changing a position;" (2) serial x-rays, which is the best way to determine loosening to see "if there is increasing progression of what we call radiolucent zones within a prosthesis bone cement"; and (3) confirmed by an arthrogram "to see if dye gets into the peri-prosthetic surrounding" on bone scans. However, Dr. Habermann stated that the best way to determine whether a hip implant has loosened is serial x-rays.

As every physician agreed, Dr. Habermann testified that loosening is a complication that can happen without malpractice:

Q Can loosening happen without malpractice on the doctor's part in surgery?

A Loosening is one of the most frequent causes of failure of total hip arthroplasty. And it is not specifically related to malpractice. It is related to that loosening is a complication of total hip arthroplasty.

(Tr. at 518).

Having reviewed Dr. Lombardi's technique and the prosthesis used, Dr. Habermann testified that the total hip replacement at issue in this case was performed in accordance "with accepted standards of surgical procedures."

Dr. Habermann also addressed the issue of the gap between the collar and the bone calcar. He stated that this situation happened in operations he performed and that it does not constitute a deviation from accepted practice. It is "one of the things that often occurs … not often, but it can occur." Dr. Habermann stated that it did not happen because the femoral canal was not properly

prepared. He also testified that "if you look at an x-ray after a collared prosthesis has been put in approximately a year down the road, a significant percentage of them do not sit on the calcar. Because in the remodeling process the calcar has disappeared. So what you end up with is a gap between the collar and the calcar." (Tr. at 525–526).

In addition, Dr. Habermann testified that the bone graft by Dr. Lombardi in the space between the calcar and the collar of the prosthesis was not medically necessary. He stated that Dr. Lombardi could have left that space "absolutely alone" and there would have been no difference whatsoever in the result. In his opinion the prosthesis was in good condition at the conclusion of the surgery. Further, the prosthesis never dislocated or loosened and the femur never became infected or fractured.

Further, as to the bone graft inserted by Dr. Lombardi, Dr. Habermann testified that it "incorporated into the body of the host bone and then became part of the host bone and then underwent remodelling changes as normal bone does when it becomes incorporated." (Tr. at 529). Reviewing the x-rays, Dr. Habermann stated that by October 5, 1995 "the previous bone graft has now incorporated and has become part of the femur." However there is a tiny space of approximately 2 millimeters between the collar and the calcar, by the process of resorption, which is not uncommon. In sum, "the bone graft has incorporated into the host bone and remodelled." (Tr. at 531).

As to whether the implant is "loosened," Dr. Habermann reviewed the serial x-rays, the arthrogram and the bone scan, and gave his interpretation:

Q Let's keep looking at these X-rays.

Do you see any sign of loosening comparing these two X-rays?

A The X-rays are slightly different projections. But there is no definitive evidence of loosening.

There is a radiolucent zone seen in the February 1994 X-ray, which is relatively shortly post-operatively. Here, medially, and slightly laterally. And that has not significantly changed to any appreciable change in that period of 18 months.

I see no indication here that this is a loose prosthesis.

Q Did you also look at the arthrogram done by Dr. Spak?

A Yes, I did.

Q Did it show loosening?

A It did not. In my interpretation it showed a lot of extravasation of dye in the tissues.

Q Did you look at the bone scan done at Huntington Hospital?

A Yes.

Q And did that show loosening?

A Not definitive loosening. It showed some increased areas of uptake. But I find that bone scans are not very accurate in determining loosening in the absence of changes on the serial X-rays.

We see increased uptake on our bone scans a year, two years after the index procedure. So, I often times don't use them. I think they are more helpful for infection than they are for loosening, especially when you use certain techniques of bone scan or white cell imaging. But I didn't really think that that bone scan showed definitive loosening.

Q Do you have an opinion to a reasonable degree of medical certainty whether Mr. Cattaneo's hip prosthesis is loose?

A Yes. I don't believe it is loose.

Q Does that include the acetabular cup as well?

A Yes.

Q Has Mr. Cattaneo's prosthesis subsided at all?

A No.

. . . .

BY MR. AGOGLIA:

Q Thank you.

It is your position, if I understand what you just read correctly, that whatever problems he has on the left side are due to back problems and not loose prosthesis; is that correct?

A Yes.

Q And it is your position, if I understand unequivocally that this prosthesis is not loose; is that correct?

A Yes.

. . . .

Q Did Gustave Cattaneo have any signs or symptoms that would lead you to find those causes of looseness that you have just listed?

A I didn't find looseness in Mr. Cattaneo's X-rays.

Q Does lack of contact between the collar of a collared prosthesis and the calcar bone of the femur cause loosening?

A No.

(Tr. at 531–533, 559, 728).

On cross examination, Dr. Habermann was closely questioned about the lucency appearing in a February 17, 1994 x-ray (Defendant's Exh. B8):

Q While you are here, if you would not mind, sir, on B–8 also, it appears that I can see, and I think you pointed out a lucent line along the shaft of the stem?

A Yes.

Q Is that correct?

A Yes.

. . . .

Q Thank you.

Those findings you just identified on B–8, would they be indicative ever of a lucent problem?

A Yes, if they were progressive. And on serial X-rays we see that exact same lucent line on the X-ray taken the moment after the operation was completed on January 4th, 1994, and that lucent line hasn't changed over a period of time.

So, the lucent line was seen on Exhibit B–6 virtually identical to that seen on Exhibit B–8. And that's just the way it looked post-operatively.

It certainly wouldn't be loose the moment it was done . . .

(Tr. at 546–547).

Turning to the difference in the plaintiff's leg lengths, Dr. Habermann testified that in such surgery a difference in leg length is frequently seen in order to obtain stability of the joint and relief from pain. The remedy for such difference is a shoe lift. Also, he stated that the difference in leg lengths would have to be greater, perhaps two inches, to be excessive. In this case Dr. Habermann testified that "one centimeter, as in this case, is not an excessive degree of lengthening." Dr. Habermann measured the legs by several different methods and determined that the left leg was between one and one and one-half centimeters longer.

Dr. Habermann concluded that the doctors at the VA "did not deviate from any accepted standards of surgical procedure in the care of Mr. Cattaneo."

The third physician presented by the defendant was an equally impressive medical witness. Dr. Hilary Ruth Umans is a diagnostic radiologist with a subspecialty in orthopedic radiology. She is board certified in diagnostic radiology. Dr. Umans has extensive experience in reading x-rays of the hip and in reviewing bone scans and arthrograms. She reviewed all the films, hospital records and the trial testimony of Dr. Rossi, the radiologist called by the plaintiff. Dr. Umans confirmed Dr. Habermann's testimony that repeated serial regular x-rays are the best tool to diagnose loosening.

Dr. Umans performed a scanogram of the plaintiff's legs and determined that his left leg is 1.5 centimeters, or slightly more than 1/2 inch, longer. She reviewed the plaintiff's x-rays taken prior to the hip implant operation and read the films to show that, prior to the operation, he had severe osteoarthritis of the left hip which nearly obliterated the joint space. Also, in 1993 Cattaneo had "much less severe sclerosis and joint space narrowing at the right hip." In addition, in 1993, the films show degenerative arthritis of L5–S1.

Dr. Umans reviewed the portable x-rays taken on January 4, 1994, immediately following the operation and related "that the position of the femoral stem is satisfactory." She also saw the lucency mentioned by the other physicians and stated that "radio lucencies about the amount of 1 to 2 millimeters is considered normal." (Tr. at 655). However, what is more important, according to Dr. Umans, is to determine if there is growth of

the lucency as time progressed. She did not detect any growth of the lucency on any of the subsequent films. Also, the lucency did not extend around the entire femoral stem, which would be corroborative of a loose prosthesis.

Dr. Umans reviewed the October 5, 1994 films and saw the same lucency and "no evidence of loosening." By that time the bone "has been incorporated into the native femur." She also reviewed the bone scan taken on November 21, 1995 and stated that the "modest increased uptake . . . is within the accepted range . . . and within the realm of normal." (Tr. at 668). She also examined the arthrogram taken on December 28, 1995 and saw no evidence of loosening. However, Dr. Umans also stated that she did not think that the bone scan is diagnostic of loosening.

As to the myelogram, Dr. Umans stated that there was a moderate herniated disc bulge at the L4–L5 level. The cat scan also revealed a herniated disc at the L4–L5 level with pressure on the L4–L5 nerve root, together with severe arthritic changes at the facets, especially at the level of L5–S1. These abnormal conditions in the plaintiff's lower spine were of long standing deviation. Dr. Umans also rendered the following opinions:

Q Okay.

Based on your review of all these films, do you have an opinion as to what is causing Mr. Cattaneo's pain?

A Not mechanical loosening of the prosthesis.

Q Okay.

Do you have an opinion to a reasonable degree of medical certainty as to whether Mr. Cattaneo's hip prosthesis is loose?

A I have an opinion that it is not.

(Tr. at 684).

The fourth and final physician produced by the defendant was Dr. Thaddeus Spak, an orthopedic surgeon, who was also one of the plaintiff's treating physicians. He first examined the plaintiff on November 13, 1995 for complaints of pain in the right and left side and inability to sleep. Dr. Spak "thought the pain in the right hip keeps him from sleeping at night." Dr. Spak performed an aspiration of the left hip to rule out infection and ordered the bone scan and arthrogram. Dr. Spak agreed with Dr. Habermann that "the classic sign of a loose prosthesis is the pain . . . getting off the chair and walking up and down steps, where the prosthesis really has an occasion to move." (Tr. at 787).

Interestingly, Dr. Spak apparently was originally of the opinion that the prosthesis was loose and then changed his mind.

Q If I understood you correctly, you testified this morning that when you performed the arthrogram it was your impression that it was a loose prosthesis, is that correct?

A Yes.

. . . .

Q And some time that day you changed your opinion; is that right?

A Yes.

THE COURT: So what does that mean then?

THE WITNESS: It is not loose, in spite of my earlier impression.

THE COURT: When it says no evidence of contrast paralleling the stem of the prosthesis, what does that mean?

THE WITNESS: The prosthesis is not loose. The contrast is not where it shouldn't be, between the prosthesis— there should be—ideally there should be no contrast between the prosthesis and the bone. And there wasn't any, which doesn't mean 100 percent the prosthesis is not loose, but it is a very strong indication that it is not.

Q Okay.

Based on your review of all these films, did you find evidence of loosening of the prosthesis?

A No, not on these X-rays.

(Tr. at 763–764, 792, 794).

It appears that Dr. Spak's main concern was Cattaneo's spine. He felt that much of the plaintiff's symptoms came from the problems in his spine, including the herniated disc between L4 and L5 and the spinal stenosis, or narrowing in the disc space. He recommended a course of treatment of cortisone injections to try to improve his spinal problems. After Dr. Spak testified at a deposition that the prosthesis was not loose, Catta-

neo cancelled his next appointment and never returned. In sum, Dr. Spak did not believe that the prosthesis was loose and did not recommend that the left hip implant be revised.

### III. ADDITIONAL FINDINGS OF FACT

The Court finds that, based on a review of all the testimony and the exhibits, the plaintiff failed to prove that the implant in the plaintiff's left hip is loose. Clinically, Cattaneo does not have the classic symptoms of "start up" pain. He testified that he has pain in the left hip even when sleeping or resting, an atypical symptom in a loosened implant. In this regard the Court credits the testimony of Dr. Habermann, Dr. Umans and Dr. Spak, the plaintiff's own treating physician, that neither the serial x-rays, nor the arthrogram or bone scan, show evidence of loosening. The lucency never changed in size and did not encompass the entire stem. On the contrary, the more dispositive serial x-rays demonstrate that the hip implant is in a good position and is not loose.

In this case, in view of the finding that the implant is not loose, the Court need not consider the second issue, namely whether Dr. Lombardi departed from accepted practice in performing the operation. However, to complete the record, the Court will determine that issue.

The Court finds that the plaintiff failed to prove that either Dr. Lombardi or any of the other surgeons departed from accepted practice in the course of the plaintiff's hip implant surgery. The Court finds that the surgical team properly prepared the femur to receive the femoral component. The Court finds that, notwithstanding the 1/4 inch gap between the calcar and the collar, the stem and the entire prosthesis was firmly and properly implanted. The Court further finds that neither the gap nor the bone graft to fill the space constituted a departure from good and accepted surgical practice. Indeed, the Court credits the testimony of Dr. Habermann to the effect that the bone graft was unnecessary, because the small space would fill in by itself.

In addition, the Court finds that a substantial cause of the bilateral pain the plaintiff is experiencing to various parts of his back, hips and lower extremities is caused by his longstanding serious low back problems. The plaintiff has suffered from lower back problems since his Army days in the early 1950s. These conditions now include a clearly defined herniated disc between L4–L5, a bulging disc between L3–L4 with irritation of the nerve roots, diffuse degenerative arthritis changes and scoliosis in the lower spine. These major spinal abnormalities were confirmed by Dr. David Leivy, the plaintiff's treating neurosurgeon.

### IV. CONCLUSIONS

The Court finds that the plaintiff failed to prove, by a preponderance of the credible evidence, that the surgeons at the Northport Veteran's Hospital departed from accepted medical practice with regard to the left hip total arthroplasty performed on January 4, 1994.

Accordingly, the Clerk of the Court is directed to enter judgment in favor of the defendant dismissing the complaint.

SO ORDERED.